**UNITED STATES of America**

v.

**Richard HORN, et al.**

**Crim. No. 92–59–01–07D.**

United States District Court,
D. New Hampshire.

Dec. 1, 1992.

As Revised Dec. 17, 1992.

Order on Motions for Reconsideration
Dec. 15, 1992.

Margaret Hinkle, Dept. of Justice, Washington, DC, for plaintiff.

Paul Ware, Boston, MA, Robert E. McDaniel, William E. Brennan, Manchester, NH, Steven M. Gordon, Concord, NH, Michael J. Liston, Cerise H. Lim–Epstein, Boston, MA, for defendants.

## REVISED ORDER [1]

DiCLERICO, Acting Chief Judge.

Defendants have been charged with conspiracy pursuant to 18 U.S.C.A. § 371 (West 1966), bank fraud pursuant to 18 U.S.C.A. § 1344 (West Supp.1992) and false statements pursuant to 18 U.S.C.A. § 1014 (West Supp.1992). The court considers the motion of Defendants Zsofka, Lee and La-Croix (the "Alpha defendants") to dismiss the indictment based on violations of Fifth and Sixth Amendment guarantees (document no. 171) and the motion of Defendants Horn, Patrick Dion and Patricia Dion (the "Horn defendants") to join the other defendants' motion to dismiss for government misconduct (document no. 186).

*Facts*

The essential facts underlying these motions are undisputed. The government advised defense counsel that approximately 10,000 documents subpoenaed by the grand jury and now in the government's possession were available for inspection and copying at Aspen Systems ("Aspen"), suite 902, 18 Tremont Street, Boston, Massachusetts. Aspen is a private company under contract with the government to maintain and manage documents produced in response to grand jury subpoenas. The fifth floor of 18 Tremont Street is occupied by the Department of Justice New England Bank Fraud Task Force, which is conducting the prosecution in this case. All defendants arranged to have some of the documents copied by an independent company, Nite Rider. In addition, the Alpha defendants or members of their staff went to Aspen on a number of occasions and inspected numerous documents while dictating file memoranda concerning the documents.

On the morning of November 9, 1992, counsel for the Alpha defendants, accompanied by Mr. Schwartz, an expert consultant, went to Aspen for further review of the documents with the specific purpose of locating material for cross-examination, for preparation of defense witnesses and for use in connection with their trial tactics and strategy. Nov. 13 Transcript ("Tr.") 104. During their review of the documents, defense counsel were informed by Carolyn Bergersen ("Ms. Bergersen"), an employee of Aspen, that she would be willing to make an occasional copy for them. Defense counsel asked Ms. Bergersen to make copies of certain documents which amounted to twenty-two pages. Unbeknownst to defense counsel, on the morning of November 9 one of the prosecutors, who appears to be the lead prosecutor in this case, instructed Nancy Barlow ("Ms. Barlow"), a prosecution paralegal, to keep a record of any documents provided to defense counsel. The lead prosecutor's affidavit ¶ 2. When Ms. Barlow asked the lead

---

1. The order has been revised to eliminate the name of the lead prosecutor.

prosecutor if Ms. Bergersen could do this by making copies for the government of what defense counsel had copied, she agreed. The lead prosecutor's affidavit ¶ 3.

During the latter part of the afternoon, defense counsel suspected that Ms. Bergersen was making two copies of each requested document. Defense counsel asked Ms. Bergersen whether she was making extra copies for the government. She responded that she could not disclose whether she was making extra copies. Defense counsel then called Ms. Barlow and asked whether Ms. Bergersen had been instructed to make duplicate copies of documents selected by defense counsel for copying. She, too, indicated she could not answer the question and referred defense counsel to the lead prosecutor. When defense counsel spoke with the lead prosecutor shortly thereafter, she admitted that duplicate copies were being made for the government.

Defense counsel asked the lead prosecutor to stop having the employee make duplicate copies, alleging it violated the constitutional rights of the Alpha defendants and the provisions of Federal Rule of Criminal Procedure 16. In addition, defense counsel requested the lead prosecutor to turn the copies over to defense counsel. She refused to do so. Defense counsel informed the lead prosecutor that they were filing a motion to seal with the court to determine whether the government was entitled to copies of documents selected by the defendants and asked her to impound and seal the documents pending judicial review of the procedure by which they were obtained. She declined to seal or impound the documents. Defense counsel called the office of the court clerk and learned that the court was unavailable to address this issue immediately. They spoke to the lead prosecutor again and repeated their request that she impound the documents and not show them to anyone, stating clearly how they believed the defendants' rights were being infringed upon. Although she had not yet seen the documents, she refused to comply with the requests of defense counsel.

On November 9 at 4:37 p.m. the Alpha defendants filed a Motion to Seal Documents Pending Court Review ("Motion to Seal") and served it on the government at 4:46 p.m. by facsimile. Government's Opposition to Defendants' Motion to Dismiss for Governmental Misconduct ("Opposition Memorandum") at 4. On the morning of November 10, Ms. Barlow went to Aspen and retrieved the government's copies of the documents. She left the documents in the lead prosecutor's Boston office.

According to the lead prosecutor's affidavit dated November 18, she received a copy of the Motion to Seal on November 10. The lead prosecutor's affidavit ¶ 8. The affidavit further notes that on November 10 she reviewed the documents herself and showed at least one of them to prosecutor Wendy Warring ("Ms. Warring") and to prosecutor John Chapman ("Mr. Chapman"). The lead prosecutor's affidavit ¶ 7. She also showed several of them to Richard Boire ("Mr. Boire") on November 12. The lead prosecutor's affidavit ¶ 9. Mr. Boire was a closing attorney for the indicted transactions and, as noted by the government, "[h]e is a significant witness because he was an agent of the bank and closed most of the transactions at issue." Opposition Memorandum at 5. Another affidavit executed November 19 by F.B.I. Special Agent John Goglia ("Mr. Goglia") states that he was present and took notes at the November 12 meeting when the lead prosecutor showed Mr. Boire at least one of the documents at issue. Goglia affidavit ¶¶ 4, 6. An affidavit filed by Mr. Boire indicates that he made a copy of one of the documents during his November 12 meeting with the lead prosecutor and Mr. Goglia. Boire affidavit ¶ 7.

The court held a status conference on November 13. During that conference, the lead prosecutor stated that she had reviewed the documents herself. Nov. 13 Tr. 134. In addition, she indicated she had shown them to Mr. Chapman and had shown the documents to one or two witnesses, including Mr. Boire. Nov. 13 Tr. 135–36. She also stated that, upon learning of defense counsels' objection to the

procedure, she had discussed the procedure with Assistant United States Attorney for the District of New Hampshire, Peter Papps ("Mr. Papps"), who indicated there was no prohibition against the procedure and that it was done all the time.[2] Nov. 13 Tr. 125–26.

At the November 13 hearing, the court asked the lead prosecutor whether the copies she had of the documents in question were the only copies. Nov. 13 Tr. 139. She replied "[t]o my knowledge." Nov. 13 Tr. 139. After further discussion, the court ordered the government to file under seal with the court the documents at issue. Nov. 13 Tr. 147. The court instructed the lead prosecutor

> In the meantime, you should seal those documents and file them under seal with the court. As long as they've been the subject of this rather extended hearing, they should be made a part of the record under seal, and *you should not copy them.* You should put them under seal, those copies that you have, and file them with the court.

November 13 Tr. 147 (emphasis added). Defense counsel filed copies of the documents under seal during the hearing (document no. 172). The court also ordered the government to file under seal affidavits of every person who had seen the documents in question. Nov. 13 Tr. 169–70.

At the November 13 hearing, counsel for the Horn defendants orally joined the Motion to Dismiss filed by the Alpha defendants. Nov. 13 Tr. 144, 145, 146.

On November 17 the court held a teleconference with all parties and scheduled an ex parte hearing with defense counsel for November 18. On November 17, the lead prosecutor directed Ms. Warring to file the documents at issue under seal with the court. The lead prosecutor's affidavit ¶ 10. The government filed a set of documents with the court on November 18 (document no. 185).

On November 18 the court conducted a series of hearings in this case. The first was an ex parte proceeding with counsel for the Alpha defendants, who proffered to the court how the documents at issue were selected, their significance to defense tactics and strategy, and the prejudice the defendants incurred due to the government's action.

The second hearing was held with all defense counsel present in chambers and with the lead prosecutor and Ms. Warring on the speaker telephone. Mr. Papps also was present for a portion of the conference. The court informed the government that the Horn defendants had requested an ex parte hearing with the court, the court had granted the request, and the hearing would be held following the conclusion of the present hearing. Nov. 18 Tr. 20. During the course of the second hearing it was revealed by the lead prosecutor that prior to filing the documents at issue under seal with the court the government made copies of the documents which it retained. Nov. 18 Tr. 38. The lead prosecutor had ordered Ms. Warring to file the documents under seal with the court and to retain copies of them. Warring affidavit ¶ 2. Ms. Warring had her secretary copy the documents before filing them with the court. Warring affidavit ¶ 4. This was in direct contravention of the court's November 13 order. The government stated it had no objection to defense counsel examining the documents the government had filed under seal to ascertain if they were the same as the documents filed under seal by the Alpha defendants during the November 13 conference. Nov. 18 Tr. 37.

The third hearing on November 18 was held ex parte with the Horn defendants. They proffered to the court in detail how the incidents described above prejudiced their defense strategy and tactics. The court then held a fourth hearing ex parte with all defense counsel to permit the Alpha defendants to note on the record that they compared the documents they filed

---

**2.** It should be noted that in her November 18 affidavit the lead prosecutor indicates she also briefly discussed defense counsels' request with the Director of the New England Bank Fraud Task Force who indicated there was no prohibition against the procedure. The lead prosecutor's affidavit ¶ 6.

under seal at the November 13 hearing with the documents filed under seal by the government on November 18 and found that two documents were missing from those filed by the government.

As a follow up to the November 18 hearings, the court on November 19 issued a written order requiring the government to file all copies of the documents and any lists or summaries of the documents under seal with the court (document no. 191). On November 19, the government filed with the court a set of documents identical to the set filed on November 18 (document no. 189(a)).

## Discussion

The Alpha defendants allege the documents obtained by the government disclose their opinion work product and taint the entire prosecution. Defense counsel contend that because the government is now in possession of their trial strategy, it can tailor its trial preparation to take into account this knowledge and that the defendants are unable to receive a fair trial and effective assistance of counsel. The Alpha defendants therefore ask the court to dismiss the indictment as the only appropriate remedy for the government's violation of their Fifth and Sixth Amendment rights.

The Horn defendants assert they have standing to challenge the government's conduct because it has prejudiced their right to a fair trial and to effective assistance of counsel. They contend they share a joint defense with the Alpha defendants in which they seek to show knowledge of the Dime Savings Bank of New York ("Dime"), the bank allegedly defrauded by the defendants, that the indicted transactions included undisclosed second mortgages. The Horn defendants argue that the documents obtained by the government pertain to that defense strategy and that prosecution of all the defendants is tainted by the government's improperly obtained knowledge of defense tactics and strategy. They, too, assert that dismissal of the indictment is the only appropriate remedy.

The government counters that, even if the documents at issue are protected work product, defense counsel waived the work

product privilege by giving the documents to Ms. Bergersen to copy. It further asserts that even if the Horn defendants and the Alpha defendants have a joint defense agreement, this is inadequate to establish standing to challenge an infringement on the Alpha defendants' work product. The government contends that the defendants have not been prejudiced by the disclosure of the documents to the prosecution, and therefore dismissal of the indictment is unwarranted.

### I. Standing of the Horn Defendants to Join the Motion

The Horn defendants allege they have standing to join the Alpha defendants' motion because they have been prejudiced by the government's misconduct. The government counters that the Horn defendants have not been injured by the government's conduct and lack standing to join the Alpha defendants' motion.

■ To establish Article III standing in a federal court action, a party must allege personal injury fairly traceable to the opponent's allegedly unlawful conduct and likely to be redressed by the requested relief. *Riverside v. McLaughlin,* —— U.S. ——, ——, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

In *United States v. Candoli,* 870 F.2d 496, 501 (9th Cir.1989), the court held that a defendant could challenge an instruction given to the jury regarding a co-defendant's mid-trial flight "on the ground that it prejudiced her right to a fair trial." The *Candoli* court further considered whether a defendant could challenge impermissibly suggestive pretrial identification procedures used to identify a co-defendant. *Id.* at 506. The court stated

[o]rdinarily, an appellant may not seek review of alleged instructional errors and evidentiary rulings that appear only to affect a codefendant. If, however, an appellant can demonstrate that the alleged error concerning a codefendant's right also has a prejudicial impact on

appellant's right to a fair trial, we must review such claims.

*Id.* at 507. Similarly, in *United States v. Spitz*, 678 F.2d 878, 880 n. 2 (10th Cir. 1982), the court found that all defendants had standing to challenge the government's conduct affecting one defendant because all defendants had been detrimentally affected by the conduct.

In *United States v. Valencia*, 541 F.2d 618, 621–22 (6th Cir.1976), the court considered whether the government's improper intrusion into one defendant's attorney-client relationship tainted the entire prosecution against all the defendants. The court held that if tainted evidence had been used to convict the defendants, all defendants were entitled to the same relief. *See id.* at 622.

The government's citation to cases holding that a defendant has standing to challenge the search of a co-defendant on Fourth Amendment grounds only if the defendant has a legitimate expectation of privacy in the place or person being searched, citing *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), are inapposite. The defendants here do not seek to challenge a Fourth Amendment violation.

■ While the interests of the Horn and Alpha defendants are not completely identical, they do share a sufficient degree of common interest, as demonstrated by their collaborative efforts in this case, to give the Horn defendants standing to claim that the prejudice suffered by the Alpha defendants also redounds to their detriment. The court finds the Horn defendants have alleged sufficient prejudice to themselves traceable to the government's misconduct involving the Alpha defendants and likely to be redressed by the requested relief, dismissal of the indictment. The court therefore grants the motion of the Horn defendants to join the Alpha defendants' motion to dismiss for government misconduct (document no. 186).

## II. The Work Product Doctrine

■ The modern work product doctrine was recognized by the Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The Court noted

[i]n performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.

*Hickman*, 329 U.S. at 510–11, 67 S.Ct. at 393. The work product doctrine grants attorneys "a zone of privacy within which to prepare the client's case and plan strategy, without undue interference." *In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1014 (1st Cir.1988) ("*San Juan Dupont*"). The work product doctrine applies in criminal as well as civil cases. *United States v. Nobles*, 422 U.S. 225, 236, 95 S.Ct. 2160, 2169, 45 L.Ed.2d 141 (1975). "Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital." *Id.* at 238, 95 S.Ct. at 2170.

■ Work product includes ordinary work product and opinion work product. *See San Juan Dupont*, 859 F.2d at 1014. Ordinary work product consists of documents and tangible things prepared in anticipation of litigation by or for an opposing party. *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 230 (1985). In the civil context, courts generally afford ordinary work product only a qualified immunity, subject to a showing of substantial need and undue hardship. *San Juan Dupont*, 859 F.2d at 1015. Opinion work product, consisting of the mental impressions, conclusions, opinions or legal theories of an attorney, deserves special protection. *Upjohn Co. v. United States*, 449 U.S. 383, 401, 101 S.Ct. 677, 688, 66 L.Ed.2d 584

(1981); *San Juan Dupont,* 859 F.2d at 1014.

Courts have held that defense counsel's selection and compilation of documents in preparation for pretrial discovery fall within the highly-protected category of opinion work product. *Shelton v. American Motors Corp.,* 805 F.2d 1323, 1329 (8th Cir. 1986); *Sporck,* 759 F.2d at 315–16; *United States v. District Council of New York City and Vicinity of the United Bhd. of Carpenters and Joiners of Am.,* 1992 WL 208284 at *12 (S.D.N.Y. Aug. 18, 1992); *James Julian, Inc. v. Raytheon Co.,* 93 F.R.D. 138, 144 (D.Del.1982). The *Sporck* court concluded that the selection process itself reveals counsel's mental impressions as to how evidence relates to issues and defenses in the litigation. *Sporck,* 759 F.2d at 315.

The First Circuit has limited the selection doctrine enunciated in *Sporck,* noting that whether material is opinion work product depends on whether the attorney has a justifiable expectation that the mental impressions revealed by the materials will remain private. *San Juan Dupont,* 859 F.2d at 1015–16; *see also Bohannon v. Honda Motor Co.,* 127 F.R.D. 536, 539 (D.Kan.1989); *In re Shell Oil Refinery,* 125 F.R.D. 132, 133 (E.D.La.1989). The *San Juan Dupont* court noted that if material will come to light during a civil trial, it is ordinary work product rather than opinion work product and is not entitled to heightened protection. *See San Juan Dupont,* 859 F.2d at 1016, 1021. The *San Juan Dupont* court distinguished *Sporck* on this basis, noting that in *Sporck,* the information was never intended to come to light. *San Juan Dupont,* 859 F.2d at 1018.

The *San Juan Dupont* court did note that although maintaining an element of surprise is not necessarily an important object of the work product doctrine, "[i]n certain very special circumstances, as where vital credibility issues can be demonstrated to exist, an attorney should have the chance not to telegraph a likely major punch." *Id.* at 1020.

■ The defendants have alleged that the government's misconduct violated their Fifth Amendment right to due process and their Sixth Amendment right to effective assistance of counsel. The First Circuit has enunciated the test for whether an alleged violation of the Sixth Amendment can be established. *United States v. Mastroianni,* 749 F.2d 900, 907 (1st Cir.1984). In order to make a prima facie showing of prejudice, the defendant must show that confidential communications were conveyed as a result of government misconduct. *See id.* at 907–08. If the defendant makes such a prima facie showing, the burden shifts to the government to show that there has been and will be no prejudice to the defendants as a result of the government's conduct. *See id.* at 908.[3]

■ During the course of preparing this case for trial, defense counsel had reviewed thousands of documents and had thousands of documents copied by an independent copier, Nite Rider. However, what happened on November 9 was significantly different from what had occurred in the past. Counsel for the Alpha defendants arrived at 18 Tremont Street accompanied by Professor Schwartz to review documents. They wanted to copy a small number of documents, culled from thousands, for very specific purposes. One of those purposes which has been referred to by defense counsel was to develop a basis for impeaching a key government witness, Mr. Boire. In addition, they culled out several documents which specifically related to other defense tactics, strategies, and problems which were revealed to the court ex parte and which the court will not reveal here to avoid compounding the problem at hand.

---

**3.** "When the government interferes in a defendant's relationship with his attorney to the degree that counsel's assistance is rendered ineffective, the government's misconduct may violate the defendant's Fifth Amendment right to due process as well as his Sixth Amendment right to counsel." *United States v. Marshank,* 777 F.Supp. 1507, 1519 (N.D.Cal.1991). The same analysis applies to determine whether a defendants' Fifth Amendment rights have been violated, resulting in ineffective assistance of counsel, as to determine whether the defendant's Sixth Amendment right to counsel has been violated. *See id.* at 1518–28.

While some of the documents that were selected will be revealed at trial by the defense, others in all probability will not be revealed. Some of the documents are relevant to vital credibility issues that the defendants have demonstrated exist to the satisfaction of the court. The documents in question might never have been noticed or discovered by the government from among the approximately ten thousand documents or, if noticed, their significance might never have been apparent or recognized.

The high degree of selectivity resulting in a relatively small number of documents being copied clearly reflected the thought processes of defense counsel. Taking into account all of the circumstances concerning the documents in question, including what was revealed to the court during the ex parte proceedings, the court finds and rules that the documents constitute a combination of ordinary and opinion work product. In view of the fact that this is a criminal proceeding where important constitutional rights of due process under the Fifth Amendment and effective assistance of counsel under the Sixth Amendment are at stake, along with the liberty interests of the defendants, this work product deserves special protection. *See Nobles,* 422 U.S. at 238, 95 S.Ct. at 2170.

### III. Waiver of the Work Product Doctrine

The government contends that, even if the selection of documents by defense counsel was protected by the work product privilege, defense counsel waived that privilege by giving the documents to Ms. Bergersen to copy. Defense counsel counter that they were unaware of Ms. Bergersen's affiliation with the Department of Justice and therefore did not waive the privilege. They note that they immediately stopped copying documents when it came to their attention that copies were being made for the government.

▉ The attorney work product privilege can be waived. *Republic of Philippines v. Westinghouse Elec. Corp.,* 132 F.R.D. 384, 389 (D.N.J.1990) (*"Philip-*

*pines"*); *Exxon Corp. v. Federal Trade Comm'n,* 466 F.Supp. 1088, 1095 (D.D.C. 1978), *aff'd,* 663 F.2d 120 (D.C.Cir.1980). It is not automatically waived, however, by disclosure of protected information to another person. *Sporck,* 759 F.2d at 317 n. 6; *Bogosian v. Gulf Oil Corp.,* 738 F.2d 587, 593 (3d Cir.1984); *United States v. American Tel. and Tel. Co.,* 642 F.2d 1285, 1299 (D.C.Cir.1980); *Colonial Gas Co. v. Aetna Casualty & Sur. Co.,* 139 F.R.D. 269, 275 (D.Mass.1991); *Philippines,* 132 F.R.D. at 389. As the Supreme Court stated in *Nobles,* 422 U.S. at 239 n. 14, 95 S.Ct. at 2171 n. 14.

> [w]hat constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances. Counsel necessarily makes use throughout trial of the notes, documents, and other internal materials prepared to present adequately his client's case, and often relies on them in examining witnesses. When so used, there normally is no waiver. But where, as here, counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents.

In *American Tel. and Tel.,* the court stated "[a] disclosure made in pursuit of such trial preparation, and not inconsistent with maintaining secrecy against opponents, should be allowed without waiver of the privilege." 642 F.2d at 1299.

In the case of *In re Atlantic Fin. Management Sec. Litig.,* 121 F.R.D. 141, 145 (D.Mass.1988) the court noted that three factors should be considered in determining whether there has been a waiver of the work product privilege:

> (1) whether the party claiming the privilege seeks to use it in a way that is inconsistent with the purpose of the privilege; (2) whether the party claiming the privilege had a reasonable basis for believing that the disclosed materials would be kept confidential, and (3) whether waiver of the privilege in these circumstances would trench on any policy elements inherent in the privilege.

The *In re Atlantic* court noted that disclosure can, in limited circumstances, be consistent with the policies underlying the work product privilege. *Id.* The court concluded that the disclosing party had no legitimate expectation of confidentiality when he submitted materials to the Securities Division of the Secretary of the Commonwealth of Massachusetts, noting he had obtained no written or oral assurances of confidentiality. *Id.*

■ The work product privilege is not instantly waived once confidential information is disclosed, but is destroyed if disclosure runs counter to the principles embodied by the adversary system. *Philippines,* 132 F.R.D. at 389. In *Philippines,* the defendant *voluntarily* turned information over to the SEC and the Department of Justice, its adversaries. *Id.* at 390–91 (emphasis added). The *Philippines* court noted that it was significant that the disclosure in that case was made voluntarily, not pursuant to a subpoena. *Id.* at 390. The *Philippines* court concluded that "once the privileged information is disclosed to any adversary the privilege is destroyed.... the same does not hold true when a party discloses information to an ally." *Id.* at 390; *see also American Tel. and Tel. Co.,* 642 F.2d at 1298.

■ In this case, defense counsel allege they were unaware that Ms. Bergersen and Aspen were affiliated with the Department of Justice. The government claims one of the prosecutors discussed with defendant Zsofka's counsel the expenses the government was incurring for Aspen to maintain the documents.

While they might have been more careful and inquired into the confidentiality issue before having the copies made, the court finds it was not unreasonable for defense counsel to assume that Ms. Bergersen was making copies only for them. Defense counsel immediately objected and stopped ordering copies when the government's practice came to their attention. In addition, they immediately proposed to the government reasonable remedial measures to maintain the confidentiality of the documents pending judicial review of the mat-ter. Therefore, the court finds under all of the circumstances that defense counsel did not intentionally or voluntarily waive the work product privilege when they asked Ms. Bergersen to make copies for them.

## IV. Prosecutorial Misconduct

The court next must determine if there was government misconduct resulting in the government's gaining possession of defense counsel's confidential work product.

On November 9, once defense counsel became aware that copies of the documents were also being made for the government and before any prejudice had been suffered by the defendants, defense counsel unequivocally put the lead prosecutor on notice concerning the defendants' position that the government's procedure was violating their constitutional rights. They promptly proposed to the lead prosecutor reasonable remedial measures to maintain the confidentiality of the documents pending judicial review of the matter. Defense counsel made it clear to the lead prosecutor that they intended to file a motion to seal with the court seeking judicial review of the government procedure. The issues being raised by defense counsel could not by any stretch of the imagination be considered frivolous by a reasonable prosecutor. Indeed, they were serious, and they should have been recognized as serious by the lead prosecutor. Having been placed on notice of the existing problem, the lead prosecutor had the opportunity, the authority, and the duty to maintain the status quo by sealing the documents pending judicial review, thereby avoiding any prejudice to the defendants, until the court had ruled on the matter.

Not only did the lead prosecutor refuse to maintain the status quo by sealing the documents, but also she exacerbated the problem when on November 10, after having received a copy of the defendants' motion to seal, she proceeded to review the documents. Further exacerbation of the problem continued when on November 12 she used one of the documents during a meeting with Mr. Boire to prepare him as a government witness. This occurred one

day before the court was scheduled to address the issue.

It was the lead prosecutor who on the morning of November 9 directed that a record be kept of documents supplied to defense counsel. The lead prosecutor's affidavit ¶ 2. While the court acknowledges that the government has a legitimate interest in maintaining the integrity and security of documents, it is disingenuous of the lead prosecutor to try to justify her actions on that basis given the events that occurred. It is also disingenuous of her to claim that it was necessary to keep a record of documents supplied to defense counsel to guard against a later claim that they were not produced given the fact that defense counsel had had open access to approximately 10,000 documents for a number of weeks. On the contrary, there is every indication that the lead prosecutor wanted to see what documents the Alpha defendants copied in order to obtain an insight into defense counsel's trial strategy, tactics, and thought processes without any concern for the rights of the defendants. The deliberate nature of her actions is made all the more evident by certain events that occurred at the hearing of November 13 and thereafter.

At the November 13 hearing, the court instructed the lead prosecutor to file the documents under seal with the court and unequivocally stated to her that "you should not copy them." Nov. 13 Tr. 147. The court also ordered affidavits filed by every person who had seen the documents. Nov. 13 Tr. 169–70. The purpose of these orders should have been obvious to the lead prosecutor. The court was trying to establish a status quo as quickly as possible to prevent further prejudice to the defendants and to bring the problem under control, something which the government should have been trying to do voluntarily. Indeed, the lead prosecutor stated at the November 13 hearing, after the court ordered the documents and affidavits filed, "[i]n hindsight, Your Honor, I would say I wish I had sealed these documents." Nov. 13 Tr. 172.

During the hearing of November 18, the court and other counsel learned for the first time that, in spite of what had transpired at the November 13 hearing and in direct contravention of the court's order, the lead prosecutor had instructed Ms. Warring to have copies made of the documents before filing them with the court. Nov. 18 Tr. 38. Not only were copies made, but as it turned out, both sets of documents when filed by the government were missing two pages. In her affidavit dated November 18, 1992, the lead prosecutor made no reference to the fact that she had directed Ms. Warring to make copies of the documents. In view of the court's instructions at the November 13 hearing and her awareness of the issues being raised, this constituted a material omission.

Additional instances of the government's conduct in this matter must be noted and taken into consideration. These instances involve a lack of candor with the court on the part of the lead prosecutor. For example, the lead prosecutor stated to the court at the November 13 hearing

[u]nbeknownst to me, until Mr. McDaniel contacted me later that day, the paralegal had asked the Aspen employee to note whatever documents were taken from the control room, that just as a matter of routine of our controlling documents, that we have under our supervision. The way in which *they* chose to do this was to simply copy whatever documents were selected to be taken by defense counsel. It came to my attention much later, when I was contacted, that this was—that this was the manner in which this notation and [sic] documents taken were made.

November 13 Tr. 115–16 (emphasis added). This contradicts the affidavits submitted by Ms. Barlow and the lead prosecutor herself. Ms. Barlow's affidavit states that "On November 9 ... [the lead prosecutor] and I agreed that I would instruct Ms. Bergersen to make two copies of any documents the defendants' counsel obtained from our files." Barlow affidavit ¶ 3. the lead prosecutor's affidavit states

[o]n Monday morning, November 9, 1992, I spoke with Nancy Barlow, a Paralegal

**750**

Specialist with the Department of Justice, regarding a request to review documents in the Government's possession by Mr. Steven Gordon and Mr. Robert McDaniel. *I asked Ms. Barlow to be present during discovery by Messrs Gordon and McDaniel and to keep a record of any documents supplied to them.*

The lead prosecutor's affidavit ¶ 2 (emphasis added). The lead prosecutor's affidavit further states that Ms. Barlow asked whether the Aspen employee "could simply make a duplicate copy for the Government of what was copied for defense counsel. I told Ms. Barlow that would be all right also." The lead prosecutor's affidavit ¶ 2–3.

In another incident evidencing lack of candor with the court, the lead prosecutor told the court at the November 13 hearing that after defense counsel questioned the procedure, she consulted with Mr. Papps. She stated

I called Peter Papps, and I presented the issue to him; and he said, "I never heard of such a thing that there was some prohibition of the government keeping a record of its discovery turned over to defendants."

And he said, "There is no such prohibition against doing that; we do it all the time."

*And I said "Well, they've asked these to be sealed;* is there any reason for that to be done?"

And his response was, "Absolutely not. Their version is ridiculous." And based not only on my experience, and my confidence that no misconduct had taken place, I also relied on the first assistant of the U.S. Attorney's office here in the District of New Hampshire.

Nov. 13 Tr. 125–26 (emphasis added). During the second hearing on November 18, Mr. Gordon, defense counsel for Lee, stated

[y]esterday I had the opportunity to speak to Mr. Papps at another proceeding and asked him if he was aware of the motion to seal, and he indicated to me that he was not aware of the motion to seal and that it was his understanding about the documents that it would be similar to a request for discovery....

Nov. 18 Tr. 3–4. Later at the hearing, the lead prosecutor stated "if Mr. Papps' recollection is that I didn't mention the motion to seal that's quite possible." Nov. 18 Tr. 5. After further discussion, the court asked Mr. Papps "[w]ere you aware that there was an objection from defense counsel and there was going to be a motion to seal the records?" Nov. 18 Tr. 10. Papps replied "[n]o, what I knew was that defense counsel were somewhere looking through papers and that the government was going to make copies of whatever the defendants made copies of." Nov. 18 Tr. 10.[4]

The series of events described in this opinion is disturbing because the rights of the defendants have been trespassed upon and the integrity of the process has been tampered with. Government prosecutors are held to an especially high standard of conduct. "[T]he government, which represents us all, should strive to be beyond reproach in the conduct of a prosecution; to expect less damages the sinews of our legal structure." *United States v. Ariza-Ibarra*, 651 F.2d 2, 17 (1st Cir.), *cert. denied*, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). In this case the conduct of government counsel has fallen below the standard to which counsel can reasonably expect to be held.

Taking into account all of the foregoing, the court finds that there was serious misconduct on the part of the lead prosecutor. The court further finds that the defendants have shown actual prejudice resulting from the government's misconduct. The government contends that its conduct caused no

---

**4.** The court has specifically noted several examples of the lead prosecutor's lack of candor with the court. Several other inconsistencies were noted in the Alpha defendants' supplemental memorandum of law in support of their motion to dismiss (document no. 204). Although the court finds it unnecessary to detail each of these other instances, the court has considered the general pattern of inconsistencies and lack of candor with the court demonstrated in this case in making its findings and in fashioning remedies.

prejudice to the defendants because it was already aware from communications with defense counsel and from defense pleadings that the defense strategy was to demonstrate that Dime and its agents knew of the undisclosed financing. Regardless of the prior general knowledge which the government had about defense strategy, the court finds based on the evidence before it, including what was revealed to the court during the ex parte hearings, that the defendants have been and will continue to be prejudiced by the government's misconduct in improperly copying and reviewing the documents in question because they provided an important insight into defense tactics, strategy, and problems. The government has thus failed to meet its burden of showing that there has been and will be no prejudice to the defendants as a result of the government's conduct. *See Mastroianni,* 749 F.2d at 908.

*V. Remedies*

The defendants argue that dismissal is the only appropriate remedy under the circumstances of this case.

 The Supreme Court has held that although courts must be responsive to proven claims that governmental misconduct has rendered counsel's assistance to the defendant ineffective,

> [a]t the same time and without detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.

*United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 667–68, 66 L.Ed.2d 564 (1981); *see also United States v. Davis,* 646 F.2d 1298, 1303 (8th Cir.), *cert. denied,* 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981); *United States v. LaRouche Campaign,* 695 F.Supp. 1290, 1313 (D.Mass. 1988).[5] The *Morrison* Court cited a case in which the defendant was totally denied the assistance of counsel, two cases in which judicial action prevented counsel from being fully effective and two additional cases in which law enforcement officers improperly overheard pretrial attorney-client conversations as examples of Sixth Amendment violations not justifying dismissal of the indictment. 449 U.S. at 364–65, 101 S.Ct. at 668.

The current state of the decisional law on this subject does not permit dismissal except in situations where the government misconduct is found to be "outrageous." While the misconduct of the government in this case must be viewed as very serious, it does not fall into that category of cases in which government conduct has been found to be outrageous. *See, e.g., United States v. Levy,* 577 F.2d 200, 202, 210 (3d Cir.1978) (court dismissed the indictment because defense strategy was actually disclosed to prosecution by a government informer/defendant who was represented by an attorney also representing another defendant in the same case); *United States v. Marshank,* 777 F.Supp. 1507, 1524 (N.D.Cal. 1991) (court dismissed the indictment because the defendant's attorney collaborated with the prosecution to build a case against him); *United States v. Orman,* 417 F.Supp. 1126, 1131–32 (D.Colo.1976) (court dismissed the indictment because the government eavesdropped on attorney-client conferences). Therefore, where dismissal is not appropriate as a remedy the court

---

**5.** Other cases note that the law does not allow dismissal of an indictment if a lesser sanction will remedy the constitutional violation caused by the prosecutorial misconduct. *See, e.g., United States v. Peveto,* 881 F.2d 844, 862 (10th Cir.), *cert. denied,* 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989) ("[T]he interest of justice would not be 'served well by the dismissal of such a serious matter, because of some mis-

deeds of the Government.'") (citing the district court's opinion in the same case); *United States v. Welborn,* 849 F.2d 980, 985 (5th Cir.1988) ("A district court exceeds the proper bounds of its power to order dismissal of an indictment with prejudice when it fails to consider whether less extreme sanctions might maintain the integrity of the court without punishing the United States for a prosecutor's misconduct.").

must narrowly tailor remedies to address the situation.

 Courts faced with prosecutorial misconduct or violations of discovery rules have considered sanctions including granting a continuance, granting a new trial, disqualifying the prosecutor, imposing disciplinary sanctions on the offender, holding the offender in contempt, publicly chastising the offender and excluding evidence. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 263, 108 S.Ct. 2369, 2378, 101 L.Ed.2d 228 (1988); *Taylor v. Illinois*, 484 U.S. 400, 413, 108 S.Ct. 646, 655, 98 L.Ed.2d 798 (1988); *Morrison*, 449 U.S. at 365, 101 S.Ct. at 668; *LaRouche Campaign*, 695 F.Supp. at 1316. The *Morrison* court noted that the proper approach to a Sixth Amendment violation is to "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." 449 U.S. at 365, 101 S.Ct. at 668.

Important rights of the defendants have been trespassed upon by the lead prosecutor impairing their right to effective assistance of counsel and a fair trial; the lead prosecutor has not been candid with the court and failed to comply with an order of the court; the defendants have been put to unnecessary additional expense to defend themselves; the time and resources of the court have been unnecessarily expended on addressing this issue; and the integrity of the process has been damaged. The court has determined that the following remedies, short of dismissal, are necessary and appropriate to provide the defendants with the effective assistance of counsel and a fair trial and to restore the integrity of the process.

1) Prior to trial, the government shall provide defendants with a written summary of each government witness' testimony, and a list of exhibits which will be introduced through or testified to by each witness.

2) Prior to trial, the government shall make Mr. Boire and Mr. Goglia available to be deposed by defendants at government expense, if defense counsel so request.

3) In view of the lead prosecutor's serious misconduct as discussed in this opinion, the court orders her removed as a prosecutor in this case. The court notes that the prosecution team is not unduly disadvantaged by this order because the team apparently includes three other prosecutors, Mr. Chapman, Ms. Warring and Mr. Robert Spencer. The affidavits filed by Mr. Chapman and Ms. Warring indicate their exposure to the documents at issue was minimal. Mr. Spencer is ordered to file an affidavit with the court detailing his exposure to the documents. The lead prosecutor is ordered not to discuss the documents with any prosecutor or witness in this case and not to participate further in any way, directly or indirectly, in the trial preparation or trial of this case.

4) During the trial, the government is prohibited from introducing any of the documents at issue and from eliciting any testimony concerning their substance through the direct testimony of any government witness or during the cross-examination of any defense witness except to the extent that the defense during the direct or cross-examination of any witness introduces any of said documents or refers to their substance.

5) The government shall reimburse defense counsel for costs and reasonable attorneys' fees incurred in litigating the issue of the government's misconduct. The court finds this appropriate because the government's action in refusing to maintain the status quo required defense counsel to seek judicial intervention to remedy the violation of the defendants' rights. Thus, the government must bear the costs of its misconduct.

6) A status conference is scheduled for 10:00 a.m. on December 2, 1992 to set a timetable for compliance with the remedies herein ordered and to schedule a date for trial.

Summary

Defendants Horn and Dions' Motion to Join the Other Defendants' Motion to Dismiss for Government Misconduct (document no. 186) is granted. Defendants' Mo-

tion to Dismiss Indictment Based on Violations of Fifth and Sixth Amendment Guarantees (document no. 171) is denied but the court orders remedial action by the government as set forth in this opinion.

SO ORDERED.

## ORDER ON MOTIONS FOR RECONSIDERATION

Motions for reconsideration of the court's order dated December 1, 1992, ("Order") have been filed by the government and defendants Lee, LaCroix, and Zsofka (joined by defendants Horn, Patricia Dion, and Patrick Dion) (document nos. 223, 228, and 239). The background relevant to these motions is set forth in detail in the court's Order and will not be reiterated here.

In its motion the government contends that the remedy requiring the government to provide defendants with witness summaries prior to trial is not adequately tailored to neutralize the taint resulting from the government's misconduct. The government argues that because such a remedy is not explicitly authorized by the Federal Rules of Criminal Procedure or the Jencks Act, 18 U.S.C.A. § 3500 (West 1985), the defendants are not entitled to the summaries. In addition, the government contends that absent an explicit statutory waiver of sovereign immunity the court cannot impose costs or attorney's fees against the government in a criminal case.

The defendants contend that the court used an incorrect standard when determining the appropriate remedies for a violation of a defendant's Sixth Amendment right to effective assistance of counsel and that the court's remedies failed to remove the taint arising from the government's misconduct. Therefore, the defendants contend that dismissal of the indictment is the only appropriate remedy.

The misconduct of the government's lead counsel in this case was serious and resulted in prejudice to the defendants. In accordance with the principles set down in *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981), it was the duty of the court to "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial." The court considered the prejudice suffered by the defendants, the rights and interests of the government and the defendants, and the damage to the integrity of the judicial process. The court took care to craft remedies which in its opinion abate the prejudice and render the playing field level again. It was not the duty of the court under the circumstances either to penalize the government or to give the defendants an inappropriate advantage but rather to restore the relative balance between the parties and the integrity of the judicial process. In addressing the circumstances that exist, the government asks for remedies that do too little and the defendants ask for a remedy that does too much. The court is satisfied that it has struck an appropriate balance, abated the prejudice, and restored the integrity of the judicial process.

 Although defendants are generally not entitled to witness summaries, in this case disclosure of the information is necessary and appropriate to eliminate the advantage gained through government misconduct. The court under its inherent supervisory power may formulate procedural rules not specifically required by the Constitution or Congress when such rules are needed to implement a remedy for violation of recognized rights or to deter illegal conduct. *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983). The prescribed remedies are properly within the court's inherent supervisory powers and will successfully eliminate the taint in the prosecution and level the playing field. To do less would result in continuing prejudice. To do more and dismiss would be inappropriate under the circumstances.

 As to the remedy awarding reasonable costs and attorneys' fees to the defendants, the court finds the reasoning of the court in *United States v. Woodley*, No.

Cr92–217Z, slip op. at 7–10 (W.D.Wash. July 31, 1992), persuasive.[1]

In circumstances similar to those in this case, the court in *Woodley* imposed costs and fees against the government. "Under such circumstances, where dismissal of the indictment is unwarranted but serious governmental misconduct has occurred, it is appropriate for the Court to fashion a suitable remedy that safeguards the integrity of the judicial process." *Id.* at 7 (citing *Bank of Nova Scotia v. United States,* 487 U.S. 250, 255, 108 S.Ct. 2369, 2373–74, 101 L.Ed.2d 228 (1988)). "Inherent in the court's supervisory power must be the ability to fashion a sanction or penalty tailored to the offensive conduct." *Id.* at 9.

As in the *Woodley* case, the remedy fashioned in this case relates directly to the misconduct and is necessary to preserve the integrity of the judicial process. *See id.* at 10. As a direct result of intentional misconduct by the government's lead counsel, the defendants were unnecessarily required to expend their resources in order to protect their rights. If the defendants' ability to defend themselves fully can be compromised by government misconduct without an appropriate remedy, then the integrity of the judicial process is damaged. The government, acting through one of its representatives, cannot place the defendants at a disadvantage, argue against dismissal, and walk away from the situation immune from accountability. Dismissal of the indictment would be the ultimate cost that the government could be required to pay for its misconduct. However, the court has found that remedy inappropriate and extreme under the circumstances of this case. Instead, in the exercise of its inherent authority to preserve the integrity of the judicial process, the court has tailored a suitable remedy in awarding the defendants reasonable costs and attorneys' fees.

Summary

Defendants' Motion for Reconsideration (document no. 223) is denied. The Motion of the United States for Reconsideration (document no. 228) is denied.

SO ORDERED.

---

1. The *Woodley* case is presently on appeal to the Ninth Circuit Court of Appeals. *See* consolidated appeal of docket nos. 92–30295, 92–30303, 92–30309, 92–30337, 92–30359.