**UNITED STATES of America**

**v.**

**Luis Fernando Quesada MOSQUERA, Jose Ramirez Ramiro a/k/a "Pollo", Javier Quesada Mosquera, Diego Quesada Mosquera, Claudia Tobon–Munoz, Jimmy Velosa–Montenegro a/k/a "Chino", Guillermo Fernandez a/k/a "Nato", Fanneth Munoz–Gomez, Gladys Toro, Marta Garcia, John Hoyos a/k/a "Checo", Efinginio Rojas a/k/a "Victor Mesa", Raul Cano, Alvaro Ortiz, Roberto Cerchiara, Norberto Castro a/k/a "Beto", Mauricio Grajales Guevara, a/k/a "Ramiro" a/k/a the "Doctor", Hector Medina a/k/a "Kevin" a/k/a "065", Defendants.**

**Nos. 92–1228 (JBW), 93–0036 (JBW).**

United States District Court,
E.D. New York.

Feb. 10, 1993.

Mary Jo White, U.S. Atty., Brooklyn, NY, by Brian T. Moriarty, for the U.S.

Donald R. Schecter, Kew Gardens, NY, for F. Quesada Mosquera.

Robert Wolf, New York City, for Ramirez Ramiro.

Richard Kwasnik, New York City, for J. Quesada Mosquera.

Juan A. Campos, Campos & Wojszwilo, New York City, for D. Quesada Mosquera.

Todd D. Greenberg, Addabbo & Greenberg, Forest Hills, NY, for Tobon–Munoz.

Gerald Rosenthal, New York City, for Velosa–Montenegro.

Richard Berne, Brown, Berne & Serra, New York City, for Fernandez.

Telesforo Delvalle, New York City, for Munoz–Gomez.

David Zapp, New York City, for Toro.

Joel M. Stein, New York City, for Garcia.

Richard Rosenkranz, Brooklyn, NY, for Rojas.

John Harris, New York City, for Cano.

Lawrence Hermann, Jackson Heights, NY, for Ortiz.

Joseph Famighetti, Axelrod, Cornachi & Famighetti, Mineola, NY, for Cerchiara.

Barry Gene Rhodes, Brooklyn, NY, for Hoyos.

Faith Colangelo, Dobbs Ferry, NY, for Castro.

James DiPietro, Brooklyn, NY, for Grajales Guevara.

Joseph Gentile, Williston Park, NY, for Medina.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge:

There are eighteen Spanish-speaking defendants in these related complex cases involving narcotics and money-laundering. All require interpreters. Each defendant is represented by a different lawyer. Ten lawyers are privately retained. Eight are assigned pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. There is good reason to believe that some defendants represented by privately retained attorneys will require CJA attorneys. We can reasonably predict that at least ten separate CJA attorneys will ultimately be appointed in this one case. Their fees and expenses will be paid for out of the budget of the United States Courts. Based on experience in this court, if the case is fully tried, CJA costs will be over a quarter of a million dollars.

■ The government's evidence includes more than 550 tape recordings in Spanish and transcripts of these tapes obtained through wiretaps. There are some 10,000 documents. Not all of the evidence pertains to all of the defendants. Defense counsels' compilation and selection of documents merit special protection in a criminal proceeding where important constitutional rights to due process and effective assistance counsel are implicated. *See, e.g., United States v. Horn,* 811 F.Supp. 739, 745 (D.N.H.1992).

The costs of reproducing and translating the materials will be considerable. There are difficulties associated with coordinating communication of defense counsel with the court and with the government. Most defendants are incarcerated in jails near and far. They and their counsel are scattered geographically. Unless steps are taken to avoid duplication of costs and effort, due process may be sacrificed and considerable delays and large costs to the government are inevitable.

In view of the shortage of budgeted court CJA funds, the anticipated cost is a matter of considerable importance. *See, e.g.,* Tom Watson, *Money Runs Out For Federal CJA Lawyers,* Legal Times, June 29, 1992 at 10 (describing how funding for court-appointed attorneys has not kept pace with the increasing number and complexity of criminal cases). Moreover, in 1993 the judiciary will be facing an "unprecedented funding crisis" and spending cuts must be made to account for a $100 million shortfall. *See Judiciary Faces Broad Spending Reductions,* The Third Branch, Newsletter of the Federal Courts, Jan. 1993 at 1. It is anticipated that the funding for the compensation of court-appointed CJA attorneys will be depleted by March of this year. *Id.* at 7. The courts have been urged to control these costs by any reasonable means.

The court must be concerned with the protection of the rights of the accused. The public interest as well as the interests of the accused require promptness in criminal proceedings. *See* 18 U.S.C. § 3161 et seq. (The Speedy Trial Act). In complex multidefendant cases, speedy trial rights are "stretched about as far as can be without making a mockery of that constitutional protection." *United States v. Gallo,* 668 F.Supp. 736 (E.D.N.Y.1987), *aff'd,* 863 F.2d 185 (2d Cir.1988), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989).

Recent federal legislation underscores Congress's concern with reducing expense and delay in our judicial system. The Civil Justice Reform Act of 1990 (the "Act") recognizes the heavy burdens placed on the court because of the increasing volume and complexity of both civil and criminal cases. 28 U.S.C. § 471 *et seq.* The statute mandates the creation of an administrative structure to ensure effective litigation

management with a focus on reduction in costs and delays. *Id. See generally* Linda S. Mullenix, *The Counter–Reformation in Procedural Justice*, 77 Minn.L.Rev. 375 (1992). The legislative history of the Act acknowledges that the scarcity of resources, particularly in jurisdictions with high drug-related caseloads, such as the Eastern District of New York, has become a "scourge" on the federal courts. 1990 U.S.Cong. & Admin.News, 6803, 6804.

In an attempt to institute procedural reforms to combat the crisis in the civil justice system, the Act requires that each district court implement a civil justice expense and delay reduction plan. 28 U.S.C. § 472. The development of such a plan requires a thorough reconsideration of the condition of the civil as well as the criminal dockets in each judicial district by an advisory group.

The Advisory Group of the Eastern District of New York conducted such an assessment in 1991. *See Final Report of the Eastern District of New York Advisory Group*, 142 F.R.D. 185 (1991). Its detailed analysis of the state of the criminal docket in this district reveals an emergency situation of critical magnitude. Criminal filings have increased at a rate far greater than the national average. *Id.* at 201. These cases tend to be much more complex and have many more defendants than in other districts. Vacant judgeships are not filled promptly. *Id.* The district's termination rate has not, and cannot, keep pace with the burgeoning criminal load. *Id.*

The Advisory Group has determined that "the criminal docket is the principal cause of unnecessary delay and expense in the civil justice system within the Eastern District." *Id.* at 204. It attributes this situation to the increasing federalization of crime, an increase in federal prosecutions as well as to changes in procedures stemming from the Speedy Trial Act and the Sentencing Guidelines. *Id.* at 205. Since that study was undertaken, an additional widespread federal crime has been added to the potential base for an exploding criminal docket. *See* The Anti Car Theft Act of 1992, 18 U.S.C. § 2119.

Statistics for 1992 reveal that the criminal docket problem is increasing. In only one year in this district there has been a 14.8% increase in filings and 11.5% increase in the number of criminal defendants. Records of the Clerk of the Court, Eastern District of New York. The problem is exacerbated by the fact that "[t]his past year, the district compiled 31.9 vacant judgeship months." *Id.* To help offset the criminal and civil caseloads, the assistance of twenty visiting judges from September 1991 to December 1992 was secured, many of them to handle only sentencing. *Id.* The Advisory Group's analysis of the overburdened criminal docket reveals that the implementation of measures to expedite the progress of complex criminal cases must be a priority for the court.

Eventually Congress and the President will recognize that it has taken a route to the suppression of drugs and crimes that arguable constitutes a misallocation of judicial resources. Until they do so the courts must do all they can to use limited resources effectively in enforcing the criminal law and protecting constitutional rights.

This court has long been mindful of the enormous burdens posed on the courts and lawyers by complex criminal cases. *See United States v. Gallo*, 668 F.Supp. 736, 754–56 (E.D.N.Y.1987), *aff'd*, 863 F.2d 185 (2d Cir.1988), *cert. denied*, 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989). Large multidefendant cases such as the instant one create severe disadvantages to defendants because many attorneys, particularly sole practitioners, can ill afford the substantial outlay of time and expense associated with the case. *Id.* While attorneys sit for countless hours in a courtroom to hear their client's name mentioned only occasionally, their private practices stagnate. Coordination of the work of defense counsel becomes almost impossible, to the disadvantage not only of defendants, but of the prosecutor and the court. Trial judges are faced with enormous problems of trial management. *Id.*

As a former chief judge of this circuit has recognized, at this "decisive moment"

for the federal courts, "[f]lexibility, experimentation and a willingness to innovate are essential if the administration of justice is to keep up with the society we serve." Irving R. Kaufman, *Reform for a System in Crisis: Alternative Dispute Resolution in the Federal Courts*, 59 Fordham L.Rev. 1, 2 (1990). Accordingly, courts must become more efficient in administering multidefendant cases without reducing individual rights. Urgent measures are needed to move cases along more swiftly. Modern techniques, special equipment and innovative use of limited personnel are essential to achieving that goal.

■ This court is obligated to establish a mechanism for reducing costs and delay in the administration of justice in these cases. The district court has the inherent power to control its own docket to ensure that cases proceed in a timely and orderly fashion. *United States v. Correia*, 531 F.2d 1095, 1098 (1st Cir.1976) (upholding district court's dismissal of indictment due to prosecutorial delay). *See also United States v. Fox*, 788 F.2d 905, 908 (2d Cir.1986) (reversing conviction and remanding for explanation of lengthy delay between *voir dire* and empaneling of the jury); *United States v. Todisco*, 667 F.2d 255, 260 (2d Cir.1981), *cert. denied*, 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444 (1982) (court has discretion to grant or refuse continuance).

■ The Federal Rules of Criminal Procedure require the court to assign counsel to defendants unable to afford a lawyer. Fed.R.Crim.P. 44. The question now posed is whether the court may assign counsel to individual defendants as well as to the case as a whole, for the purpose of effective management to avoid unnecessary expense and delay. The answer is yes.

The Rules of Criminal Procedure "shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay. Fed.R.Crim.P. 2. *See, e.g., United States v. Debrow*, 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953) (refusing to dismiss perjury indictment based on technical omission of name of person who administered the oath). The Rules are designed to "promote economy and efficiency and to avoid a multiplicity of trials." 1 Charles Alan Wright, Federal Practice and Procedure § 31 at 24 (2d ed. 1982). "Rule 2 demands that a court attend both to the needs of the individual litigants and to the public at large and approach procedural problems flexibly so that justice, fairness in administration, and efficiency are accommodated." *United States v. Broadus*, 664 F.Supp. 592 (D.D.C.1987) (court has inherent supervisory power to review the sufficiency of the evidence in support of a criminal conviction).

■ The Rules are not intended to be a "rigid code" with "an inflexible meaning irrespective of the circumstances." *Fallen v. United States*, 378 U.S. 139, 142, 84 S.Ct. 1689, 1691, 12 L.Ed.2d 760 (1964) (rejecting restrictive interpretation of rule providing for taking of appeal within ten days). Ritualistic application of the rules is to be avoided. As Justice Black remarked in his dissent to the Court's summary affirmance in *Berman v. United States*, 378 U.S. 530, 538, 84 S.Ct. 1895, 1899, 12 L.Ed.2d 1012 (1964), "The Criminal Rules were framed with the declared purpose of ensuring that justice not be thwarted by those with too little imagination to see that procedural rules are not ends in themselves, but simply means to an end: the achievement of equal justice for all."

■ The Criminal Justice Act recognizes that it is not enough merely to provide a defendant with a lawyer. It authorizes the court to furnish "investigative, expert and *other services necessary for adequate representation.*" 18 U.S.C. § 3006A(a) (emphasis supplied). These "other" supportive services are often essential to an adequate defense. *See United States v. Durant*, 545 F.2d 823 (2d Cir.1976) (reversing conviction and remanding for new trial based on district court's denial of fingerprint expert as "necessary" under the Criminal Justice Act). Since the inception of the Act, most requests for "investigative, expert, or other services necessary to an adequate defense" have related to the hiring of experts, *see id.;* investigators, *United States v. Sutton*, 464 F.2d 552 (5th Cir.

1972); psychiatrists, *United States v. Bass*, 477 F.2d 723 (9th Cir.1973).

A broad reading of the statute permits the court to consider other measures that might be necessary to an adequate defense in this case. *See United States v. Oliver*, 626 F.2d 254, 259 (2d Cir.1980). Such determinations are to be made on a case by case basis. *United States v. Theriault*, 440 F.2d 713, 715 (5th Cir.1971), *cert. denied*, 411 U.S. 984, 93 S.Ct. 2278, 36 L.Ed.2d 960 (1973).

■ The court finds that the large number of non-English speaking defendants, the corresponding number of lawyers and the burdensome number of tapes and documents in these cases suggests that the efforts of defense counsel be coordinated. This will result in a savings of both time and money to the government and the judicial system as well as help to preserve the defendants' rights.

■ "The court should encourage defense counsel in multi-party cases to organize themselves for trial." Manual for Complex Litigation § 32.12 (2d ed. 1985). There is no statutory bar to the appointment of more than one attorney in a particular case. *United States v. Aadal*, 280 F.Supp. 866, 868–89 (S.D.N.Y.1967) (approving multiple representation of one defendant where "extraordinary circumstances" require "protracted litigation").

The Judges' Manual for the Management of Complex Criminal Jury Trials (1982), § 2.3, recommends that defense counsel select one among them to be lead counsel. There is a danger in this practice, however. Appointing lead counsel from among present attorneys to reduce costs and delay may result in conflicts even though much cooperation among counsel on a voluntary basis is not unusual. Particularly in drug cases, the leading defendants may use their control of the case to disadvantage their underlings.

While the court has full confidence in the professionalism of all defense counsel in the present case, it must be vigilant against even the hint of a possibility of domination of the defense by a drug king-pin. The Federal Rules make clear that the court must take measures to ensure that no conflicts of interest arise where two or more defendants are represented by the same counsel. Fed.R.Crim.P. 44(c). The court is advised to use its discretion "for the measures which will best protect each defendant's right to counsel may well vary from case to case." Fed.R.Crim.P. 44 advisory committee's note.

All parties agree that it will be useful to appoint under the CJA an administrative coordinating counsel ("Coordinating Counsel"). Under the special circumstances of the present case, the court concurs.

There probably will be considerable saving of government funds, increased speed in completing these cases and more effective protection of both defendants' and the government's rights if these defendants' handling of documents, tapes, transcripts and evidence can be coordinated. Such coordination will not impinge on the right of each defendant to independent counsel and full individual due process.

Fortunately, a highly respected and experienced attorney has agreed to act as Coordinating Counsel. She is Eleanor Jackson Piel, Esq. Ms. Piel is admitted in the following courts: The Supreme Court of the United States, the courts of appeal for the First, Second, Fifth, and Eleventh Circuits and the district courts for the Eastern, Southern and Western Districts of New York. In a legal career that spans more than three decades Ms. Piel has become an acknowledged leader of the bar. After obtaining her law degree from the University of California, Berkeley, Ms. Piel served as a judicial clerk to the Honorable Louis E. Goodman in the District of San Francisco. She has held numerous and diverse positions including California Deputy Attorney General, Advisor to the Supreme Command Allied Powers and at the Legal Aid Society of New York. She has served on many important professional and community boards and is a member, among other organizations, of the American Bar Association, New York County Lawyers Association, New York State Bar Association and New York Criminal Bar Association. She has

had a wealth of experience in both criminal and civil matters.

The court and the parties are grateful that she is willing to undertake the enormous task of setting up a prototype. Advantages of this procedure will be maximized and the possible pitfalls minimized by Ms. Piel's participation.

The court appoints Eleanor Jackson Piel to serve as administrative Coordinating Counsel for the defense. She is appointed for "good cause" shown for all CJA defendants. 18 U.S.C. § 3006A(b). She will serve at the pleasure of the court. She will receive CJA compensation plus all expenses associated with this office. 18 U.S.C. § 3006A(d).

Coordinating Counsel will not be specifically assigned to represent any particular defendant. Nor will she serve as a legal advisor to any defendant or any counsel. She will not appear on any motions involving any substantive or procedural issues unless they have some administrative aspect.

The role of Coordinating Counsel shall not involve any *ex parte* communication with the court nor any plea negotiations between individual defendants and the government. Rather, the role of Coordinating Counsel will be limited to ensuring the smooth administration of the case and the coordination of efforts among defense counsel to maximize efficiency and economy and to comport with the requirements of due process. Coordinating Counsel may assist the privately retained attorneys to encourage cooperation between the privately retained and CJA attorneys. Such cooperation is desirable and is consistent with due process where it does not create conflicts. It is a means to increase the efficiency of the court.

The responsibilities of Coordinating Counsel will be as follows:

1. coordinate communication with the court;

2. coordinate communication with the government on administrative matters only, except as requested by all defense counsel;

3. assist defense counsel in identifying documents relating to particular defendants and, as requested, suggest to each defense attorney the number of support persons necessary to review the materials for his or her client;

4. retain, where necessary, paraprofessionals to handle documents and perform other relevant tasks;

5. secure space to house materials related to the case;

6. utilize computers and other techniques for efficiently handling documents, tape recordings, witness statements and other materials associated with the case;

7. obtain interpreters and translations as needed;

8. coordinate communication among defense counsel by arranging teleconferences or meetings;

9. make recommendations to the court regarding access of defendants to each other and to counsel;

10. provide libraries containing evidence and documents accessible to defense counsel and incarcerated defendants;

11. take such further action as will assist the court and defense counsel in expediting the case and providing due process at the least possible cost to the government;

12. recommend such secrecy or sealing orders as may be necessary;

13. evaluate the techniques used for possible use in future cases.

Necessary office space, computers, paraprofessional, files, interpreters shall be obtained upon approval of the court when "necessary for adequate representation." 18 U.S.C. § 3006A(e).

A pilot project of this magnitude will require evaluation. Fortunately, a most distinguished member of the New York and federal bars has agreed, at the request of counsel and the court, to act as a consultant for the project. He is Professor Gerard E. Lynch of the Law School of Columbia University. After a distinguished undergraduate and law school education at Columbia University, he served as law

clerk to Judge Wilfred Feinberg in the Second Circuit Court of Appeals from 1975 to 1976. He then went on to clerk for Justice William J. Brennan, Jr. in the United States Supreme Court during the 1976–1977 term. He has been a member of the Columbia law faculty since 1977 where he specializes in constitutional law, criminal law, criminal procedure and clinical teaching. From 1988 to 1990 he served as an Associate Counsel for the Office of Independent Counsel for Iran–Contra. From 1990 to 1991 he took a leave from Columbia to serve as the Chief of the Criminal Division of the Office of the United States Attorney for the Southern District of New York. Professor Lynch will act as an unpaid advisor for the project. He will evaluate the prototype to ensure maximum efficiency and effectiveness of the experiment.

This order is necessary in view of the large criminal caseload in this court and the long-unfilled vacancies, requiring heroic measures to dispose of criminal cases under the Speedy Trial Act at the least possible cost to the government. 18 U.S.C. § 3161. "Appointment of counsel in multi-defendant cases" has been a matter of particular concern to Congress. Pub.L. No. 101–650, Title III, § 318(b)(9), December 1, 1990, 104 Stat. 5116, *reprinted in* Federal Criminal Code and Rules (West 1991), Revised Ed. at 744.

Each defendant and each defense counsel is deemed, without objection, to have consented to the appointment of Coordinating Counsel; to have acknowledged that Coordinating Counsel is solely to provide administrative assistance and is not functioning as legal counsel within the meaning of the sixth amendment; and to have agreed that defense counsel retains the sole obligation to represent defendant.

SO ORDERED.