UNITED STATES of America

v.

Luis Fernando Quesada MOSQUERA, Jose Ramirez Ramiro a/k/a "Pollo", Javier Quesada Mosquera, Diego Quesada Mosquera, Claudia Tobon–Munoz, Jimmy Velosa–Montenegro a/k/a "Chino", Guillermo Fernandez à/k/a "Nato", Fanneth Munoz–Gomez, Gladys Toro, Marta Garcia, John Hoyos a/k/a "Checo" Efinginio Rojas a/k/a "Victor Mesa", Raul Cano, Alvaro Ortiz, Roberto Cerchiara, Norberto Castro a/k/a "Beto", Mauricio Grajales Guevara a/k/a "Ramiro" a/k/a the "Doctor", Hector Medina a/k/a "Kevin" a/k/a "065", Defendants.

Nos. CR 92–1228(JBW),
CR 93–0036(JBW).

United States District Court,
E.D. New York.

March 16, 1993.

Mary Jo White, U.S. Atty. by Cheryl Pollak, David C. James, Brian T. Moriarty, Brooklyn, NY, for U.S.

Donald R. Schecter, Kew Gardens, NY, for defendant F. Quesada Mosquera.

Robert Wolf, New York City, for defendant Ramirez Ramiro.

Richard Kwasnik, New York City, for defendant J. Quesada Mosquera.

Juan A. Campos, Campos & Wojszwilo, New York City, for defendant D. Quesada Mosquera.

Todd D. Greenberg, Addabbo & Greenberg, Forest Hills, NY, for defendant Tobon–Munoz.

Gerald Rosenthal, New York City, for defendant Velosa–Montenegro.

Richard Berne, Brown, Berne & Serra, Bronx, NY, for defendant Fernandez.

Telesforo Delvalle, New York City, for defendant Munoz–Gomez.

David Zapp, Leonia, NJ, for defendant Toro.

Joel M. Stein, New York City, for defendant Garcia.

Richard Rosenkranz, Brooklyn, NY, for defendant Rojas.

John Harris, New York City, for defendant Cano.

Lawrence Herrmann, Jackson Heights, NY, for defendant Ortiz.

Joseph Famighetti, Axelrod, Cornachi & Famighetti, Mineola, NY, for defendant Cerchiara.

Barry Gene Rhodes, Brooklyn, NY, for defendant Hoyos.

Faith Colangelo, Dobbs Ferry, NY, for defendant Castro.

James DiPietro, Brooklyn, NY, for defendant Grajales Guevara.

Joseph Gentile, Williston Park, NY, for defendant Medina.

Eleanor Jackson Piel, New York City, administrative coordinating counsel.

Asian American Legal Defense & Educ. Fund, Asian American Bar Ass'n, by Margaret Fung, Stanley Mark, New York City (Vladeck, Waldman, Elias & Engelhard, P.C. by Denny Chin, of counsel).

The Legal Aid Soc., Federal Defenders Services Unit, E.D.N.Y. by Leonard F. Joy, Brooklyn, NY.

New York Civil Liberties Union Foundation by Arthur N. Eisenberg, Norman Siegel, New York City (White & Case by Allan L. Gropper, Helen A. Feuer, James M. Wicks, of counsel).

Puerto Rican Legal Defense and Educ. Fund by Sandra Del Valle, New York City (Community Service Soc. of New York by Juan Cartagena, New York City, of counsel).

Mexican American Legal Defense & Educ. Fund by Esteban Lizardo, Los Angeles, CA.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

### I. FACTS AND PROCEDURAL HISTORY

There are eighteen Spanish-speaking defendants in these related complex cases alleging narcotics and money-laundering offenses. All require interpreters. Each defendant is represented by a different lawyer. Ten lawyers are privately retained. Eight are assigned pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A.

The government's evidence includes some 10,000 documents. There are also more than 550 tape recordings and transcripts of those tapes obtained through wiretaps. Because of the difficulties in coordinating communication of defense counsel with the court and with the government in this complex case, and in an attempt to reduce delays and costs, Administrative Coordinating Counsel was appointed. *See United States v. Mosquera et al.,* 813 F.Supp. 962 (E.D.N.Y.1993).

On December 9, 1992, at a conference with defendants and their counsel, all present recognized the obstacles faced by the non-English speaking defendants in fully understanding the nature of the proceedings. The single interpreter assigned to simultaneously translate the proceedings for all the defendants was, in the court's view, unable, despite her excellent skills, to keep each individual defendant fully apprised of what was going on. The defendants did not even have a copy of the original indictment in a language they could understand and discuss with their friends, relatives and counsel.

The court issued an order that states in pertinent part:

The government shall supply a copy of the indictment translated into Spanish for each defendant. All documents, except motion papers and original evidence, shall be translated into Spanish.

On January 15, 1993, the government moved for reconsideration of the order on the grounds that 1) the court exceeded its authority because the order is not supported by any constitutional statute or rule nor is it a valid exercise of the court's supervisory pow-

er and 2) compliance with the order would be "so burdensome as to be plainly unreasonable." Government's Mem. of Law at 5. The government also contends that Congress did not make an appropriation for this purpose and that courts lack power to act where money will need to be expended without Congressional appropriation. Letter filed March 10, 1993.

All interested parties were invited to submit briefs in response to the government's motion. Argument was heard on March 3, 1993. The court expresses its gratitude to counsel for amici, defendants and the government for their helpful briefs and oral presentations.

Both in New York City and in the suburban counties of Nassau and Suffolk, the Eastern District of New York is becoming more and more multilingual. *See Agencies Face Language Barriers*, N.Y. Times, July 4, 1992 at B8 (nearly 40 percent of New York City's population speaks a language other than English). The number of non-English speaking immigrants has risen dramatically in the past ten years. It has been estimated that nearly 31 million people in the United States do not use English as their primary language. *See* John M. Knox, *Courts are Dialing for Interpreters*, Nat.L.J., Feb. 1, 1993 at S10. The language barrier is affecting our court system by "increasingly impeding the swift, effective delivery of justice." *Id. See also* Katherine Long, *Immigrants Pose Challenge for Courts—Critical Differences Cause Trouble*, Seattle Times, Nov. 30, 1990 at C3 ("A defendant who doesn't speak English presents a peculiar problem to the judicial system. Sometimes, for example, the crime they're accused of is common practice in their home country ... [T]he very concept of the American-style judicial system is completely foreign.").

In 1991 interpreters were required in more than 68,000 federal court proceedings. *Court Interpreters Adapt to Changing Populations*, The Third Branch, Feb. 1993 at 2. In the Eastern District alone, in fiscal year 1992, there were a total of 3,019 in-court and 554 out-of-court recorded events requiring interpreters in all languages. Records, Clerk of the Court, Eastern District of New York.

The interpretation problem is far more pervasive than court records indicate. In many instances when interpreters are not available, conversations between counsel and client or defendant and government or court personnel take place in halting English or, in the case of a few attorneys who are fluent in a foreign language, in the foreign language. Sometimes relatives or friends of defendants or privately retained interpreters are relied upon outside the courtroom.

Regrettably, the courts are faced with a severe shortage of qualified interpreters to handle this increasing multilingual caseload. Generally interpreters are certified by way of examination. Currently, however, certification examinations are offered only for Spanish, Haitian-Creole, Navajo and sign language. *Court Interpreters Adapt to Changing Populations*, The Third Branch, Feb. 1993 at 2. Programs are underway to develop examinations for ten other languages. *Id.*

There are only sixty staff interpreters assigned to all the federal courts, and 430 certified free-lance interpreters. *Id.* Where less common languages are involved, the clerk of the court must find an interpreter. The demands on such interpreters are high—they must not only be familiar with the informal slang of the defendants they assist, but also with technical and legal terms. As a result, the pass rate for the certification examination is only about 24 percent for the written portion and under 4 percent for the written and oral portions combined. *Id.*

The situation in the Eastern District of New York is particularly critical. The thirteen judges and nine magistrates are served by only three staff interpreters for Spanish. Report of the Clerk of the Court, Eastern District of New York. The District has requested that two more staff interpreters be assigned, and one has been allotted effective October 1993. *Id.* The costs in this District for interpretation services are substantial. In fiscal year 1992 nearly half a million dollars was disbursed for interpreters fees. *Id.* For 1993 it is estimated that the district's projected need will far exceed its allotment. *Id.*

The difficulties encountered by non-English speaking defendants facing our judicial system were described eloquently at the hearing by the distinguished defense counsel Lawrence M. Herrmann, who has traveled widely abroad and is fluent in Spanish.

> The cultural differences are ... dramatic between what we monolithically construe as our Anglo–Saxon or Judao–Christian or American system, [and foreign cultures. We cannot say that] someone ... who grew up in a Puerto Rican family in New York or a Cuban American family in Florida ... speak[s] the same language as someone of Italian descent from Argentina, [or] someone from the closed Indian society of Quito or La Paz....

> [T]hese people come from a country [,Colombia,] where the Napoleonic Code is in force.... Possession is actual; it's never constructive. The concept of conspiracy doesn't exist. The word "sentence" means any decree of the court. "Juicio" means trial.... [T]o [defendants] "juicio" is every time they come to court.

> The idea of having a complaint ... the concept of dominion and control .. the concept of exercising all the attributes of possession by what you say and what you do are [completely] foreign to a country where [it is very possible they might not] get due process.

Our institutions and our laws have partially responded to linguistic changes in our population. *See, e.g.,* Voting Rights Language Assistance Act of 1992, 42 U.S.C.A. § 1973aa–1a (expanding requirement that voting materials and ballots be published in the minority language to groups with more than 10,000 voting-age citizens with limited English proficiency in a county as counted by the U.S. Census Bureau). The revised voting standard translates into a requirement that bilingual ballots in Chinese be used for the first time in New York City. Outlook, Asian American Legal Defense and Educational Fund, Winter, 1993 at 1. *See also* Court Interpreters Act, 28 U.S.C. §§ 1827, 1828 (establishing a program to facilitate the use of interpreters in judicial proceedings instituted by the · United States); *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (mandating creation of appropriate programs for non-English speaking Chinese students in San Francisco school system who were being denied meaningful opportunity to participate in the public education program); Aspira Consent Decree (mandating program of bilingual education for students of hispanic origin in the New York City Public Schools) as described in *Aspira of New York, Inc. v. Board of Education of the City of New York,* 423 F.Supp. 647 (S.D.N.Y.1976). *See generally* Note, *"Official English": Federal Limits on Efforts to Curtail Bilingual Services in the States,* 100 Harv.L.Rev. 1345, 1349–53 (1987) (overview of federal recognition of language minorities' rights).

It is interesting to note that the New York City school system has recognized the special due process problems presented by non-English speaking students and their families. When a student is suspended because of a serious offense such as weapons possession or assault, the Hearing Office ascertains the language spoken by the student and his family. The official suspense notification letter and the procedures to be followed are available to be sent to the family in five foreign languages (Spanish, Chinese, Haitian–Creole, French and Korean) as well as in English. An interpreter is provided at the hearing. *See* materials on file under CR 92–1228 (E.D.N.Y.).

## II. LAW

### A. *Authority of the Court*

#### 1. Constitutional

Important Sixth Amendment rights are implicated in the court's order of December 9. These include the right to be meaningfully present at one's own trial, to assist in one's own defense, to have effective assistance of counsel and to confront the government's witnesses on cross examination. U.S. Const. amend. VI.

To be "present" implies more than being physically present. It assumes that a defendant will be informed about the proceedings so he can assist in his own defense. "[I]f the right to be present is to have meaning [it is imperative that every criminal de-

fendant] possess 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" *United States ex rel. Negron v. State of New York*, 434 F.2d 386, 389 (2d Cir.1970), *quoting*, *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960) (vacating murder conviction where interpreter provided defendant with summaries rather than verbatim account of the proceedings).

■ Effective assistance of counsel is impossible unless the client can provide his or her lawyer with intelligent and informed input. Counsel, however expert, is still just an "aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally." *Faretta v. California*, 422 U.S. 806, 820, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975).

A defendant's right to have "real notice of the true nature of the charge against him [is] the first and most universally recognized requirement of due process." *Smith v. O'Grady*, 312 U.S. 329, 334, 61 S.Ct. 572, 574, 85 L.Ed. 859 (1941). "Because potential prejudice inheres in the denial of [this right], prejudice is usually assumed" when it is shown to be denied. *Dickey v. Florida*, 398 U.S. 30, 54–55, 90 S.Ct. 1564, 1577, 26 L.Ed.2d 26 (1970).

The confrontation clause requires that "the accused ... know ... the nature and cause of the accusation he is called upon to answer, and all necessary means must be provided to this end." *Terry v. State*, 21 Ala.App. 100, 105 So. 386, 387 (1925) (reversing conviction of a deaf mute). *See also State v. Vasquez*, 101 Utah 444, 121 P.2d 903, 906 (1942) (reversing conviction of a Mexican national who was denied an interpreter).

■ The due process clause also prohibits trying the criminal defendant who lacks capacity to understand the proceedings, to consult with counsel or to assist in the preparation of his defense. *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). This prohibition refers not only to mental incompetents, but also to those who are hampered by their

inability to communicate in the English language. *United States ex rel. Negron v. State of New York*, 434 F.2d 386 (2d Cir.1970). *See also Augustin v. Sava*, 735 F.2d 32, 37 (2d Cir.1984) (due process requires that the Immigration and Naturalization Service furnish an alien faced with deportation with "an accurate and complete translation of official proceedings"); *United States v. Martinez*, 616 F.2d 185, 188 (5th Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981); *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir.1973), *cert. denied*, 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974) ("The right to an interpreter rests most fundamentally ... on the notion that no defendant should face the Kafkaesque spectre of an incomprehensible ritual which may terminate in punishment."); *cf. Rex v. Lee Kun*, 1 K.B. 337, 343 (1916) (although inconvenient and more time-consuming, supplying an interpreter is "in consonance with the scrupulous care of the interests of the accused which has distinguished the administration of justice in our [English] criminal Courts."). As the court of appeals for this circuit put the matter:

> Particularly inappropriate in this nation where many languages are spoken is a callousness to the crippling language handicap of a newcomer to this shores, whose life and freedom the state by its criminal processes chooses to put in jeopardy.

*United States ex rel. Negron v. State of New York*, 434 F.2d 386, 390 (2d Cir.1970).

The Court of Appeals has noted that the law does not "insist upon requiring a state to provide indigent defendants with every *convenience* that it or a wealthier defendant can afford." *United States v. Sliker*, 751 F.2d 477, 491 (2d Cir.1984) (emphasis supplied). Translations of critical documents are much more than a convenience.

### 2. Statute

The Court Interpreters Act, 28 U.S.C. §§ 1827, 1828 (the "Act") provides additional authority for the order of December 9. It requires supplying interpreters on motion of the party or the court when a criminal defendant does not understand English. The Act states in relevant part:

The presiding judicial officer ... *shall* utilize the services of the most qualified interpreter ... available ... in judicial proceedings instituted by the United States, if the presiding judicial officer determines *on such officer's own motion* or on the motion of a party that such party ... speaks only or primarily a language other than English ... so as to inhibit such party's comprehension of the proceeding or communication with counsel or the presiding judicial officer.

28 U.S.C. § 1827(d)(1)(A) (emphasis supplied).

■ So long as the purposes of the Act are met, the use of interpreters is a matter in the sound discretion of the trial court. *United States v. Sanchez,* 928 F.2d 1450, 1455 (6th Cir.1991). It is up to the trial court to decide on the extent and nature of translation services needed by the defendant. *United States v. Lim,* 794 F.2d 469, 470 (9th Cir.), *cert. denied sub nom., Ahn v. United States,* 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986). "[P]roper handling of translation hinges on a variety of factors, including ... the complexity of the proceedings," and it is the trial judge who is in the best position to determine if translation services are needed. *Valladares v. United States,* 871 F.2d 1564, 1566 (11th Cir.1989). *See United States v. Moya–Gomez,* 860 F.2d 706, 740 (7th Cir.), *cert. denied sub nom., Estevez v. United States,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989) (affirming the trial court's determination that the interpreter performed adequately); *United States v. Coronel–Quintana,* 752 F.2d 1284, 1291 (8th Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985) (affirming trial court's refusal to provide interpreter during *voir dire* to a defendant who had resided in the United States for seven years); *United States v. Frank,* 494 F.2d 145, 157 (2d Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974) (allowing prosecution witness who spoke Spanish to use an interpreter even though the witness spoke fluent English).

The Act does not specifically address the right to translated documents. Its legislative history indicates that it was "not intended to supersede other non conflicting, statutory rights regarding appointment of interpreters." 1978 U.S.Code & Cong.News 4657.

Power to require interpretation of testimony or writings is also provided by the CJA. *See* 18 U.S.C. § 3006A(a). The court is authorized to furnish "investigative, expert and *other services necessary for adequate representation.*" (emphasis supplied). These "other" supportive services are often essential to an adequate defense. *See United States v. Durant,* 545 F.2d 823 (2d Cir.1976) (reversing conviction and remanding for new trial based on district court's denial of expert under CJA). They include expert interpreters' work.

### 3. Rule

Federal Rule of Criminal Procedure 28 authorizes the court to "appoint an interpreter ... [whose] compensation shall be paid out of funds provided *by law or by the government,* as the court may direct." (emphasis supplied). The Rules of Criminal Procedure, particularly in complex criminal cases, must be "construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." Fed.R.Crim.P. 2. *See also United States v. Mosquera,* 813 F.Supp. 962, 966 (E.D.N.Y. 1993) (citations omitted).

### 4. Inherent Power

A federal court's inherent power to control criminal practice has long been recognized. *See Heckers v. Fowler,* 69 U.S. (2 Wall.) 123, 128, 17 L.Ed. 759 (1864). The judge is "guided by considerations of justice." *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983), *cert. denied,* 469 U.S. 1218, 105 S.Ct. 1199, 84 L.Ed.2d 343 (1985). The court "has the responsibility to supervise the administration of criminal justice in order to ensure fundamental fairness." *United States v. Baird,* 414 F.2d 700, 710 (2d Cir.1969), *cert. denied,* 396 U.S. 1005, 90 S.Ct. 559, 24 L.Ed.2d 497 (1970).

Courts must ensure that "every defendant stand[s] equal before the law." *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963). Providing for the orderly administration of justice to assure equality is vital. *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 612, 87 L.Ed.

819 (1943); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). A court's supervisory power "extends to establishing and maintaining those higher standards necessary and helpful in promoting fair adjudications and securing the integrity of the federal court system." *United States v. Jamil*, 546 F.Supp. 646, 659 (E.D.N.Y.1982), *rev'd on other grounds*, 707 F.2d 638 (2d Cir.1983). The court need not limit itself to "merely enforcing the minimal standards of conduct and procedure derived from the Constitution." *Id.*

■ Due process demands that criminal defendants be given the means to understand the charges lodged against them as soon and as fully as practicable. It is fundamental that a defendant must be told what he has been accused of in a language he or she can understand. This is the responsibility of the government, which brought the charges, not of the defendant.

For a non-English speaking defendant to stand equal with others before the court requires translation. Non–English speaking criminal defendants currently are at a substantial disadvantage. A criminal defendant cannot aid in his own defense without meaningful access to relevant documents he or she can understand. As one commentator has observed:

> In a country which was settled by alien immigrants and which continues to receive hundreds of thousands of immigrants and foreign travelers annually, the problem of protecting the rights of the non-English speaking accused cannot continue to be ignored by our judicial system.... [O]ur legal system must be flexible and must be able to adapt itself to fit the situation by giving importance to the protection of the substantive rights of the individual and must not be bound by technical or artificial procedural devices.
>
> Each English-speaking "citizen" of the United States is outraged and belligerent when he reads of the problems encountered by a fellow citizen involved, innocently or otherwise, in a crime in a foreign country in which that same person is tried and sentenced in the "foreign" country according to the "foreign" legal system.

> Each person can empathize and imagine himself in an alien society confronted by a strange legal system, with his future hanging in the balance of justice, and not able to understand any of the testimony being offered against him.... His only contact with the proceeding would be the points his court-appointed counsel thought important enough to be communicated to him.

Benjamin G. Morris, *The Sixth Amendment's Right of Confrontation and the Non–English Speaking Accused*, 41 Fla.B.J. 475, 481–82 (1967).

■ Just as summaries of testimony were inadequate in *United States ex rel. Negron v. State of New York*, 434 F.2d 386, 390 (2d Cir.1970), so too is an interpreter's oral description of the contents of a critical document insufficient. Oral interpretations and written translations serve different purposes. While an oral interpretation can provide momentary understanding of representations contained in a document, a criminal defendant may need and want to review the document alone and with others to achieve a full understanding. Defendants are often incarcerated in widely scattered facilities. They may want to consult with friends and family, or prepare questions for their attorneys. Without written translations, they would have to rely on their memory of an oral interpretation. that occurred under circumstances where they might feel ill-at-ease and have difficulty concentrating.

Defense counsel loses a valuable resource if his or her client cannot understand the charge and supporting facts. Significance of detailed factual representations may escape the lawyer, but not the client who is familiar with the circumstances surrounding his case. Ultimate success in court may depend on careful pre-trial investigation based on hints from the client. Inadequate input from the client who has failed to understand the evidence to be relied upon by the government cannot be cured by the presence of an official court interpreter at a hearing or at trial.

The suggestion that non-English speaking defendants can rely on inmates who speak their language to facilitate their understanding of documents is unacceptable. Many de-

fendants wisely do not wish to share their cases with strangers. Informants may be present.

The difficulty in interpreting Chinese presents a special problem different in detail from that of the instant Spanish-speaking defendants, yet revelatory of the general issues. The many Chinese dialects have different oral pronunciation greatly affected by pitch and tone. The written language is essentially uniform. Given that there are only a handful of reliable Chinese interpreters to serve all of New York City, orders such as the present one will help alleviate a burden rather than create one. *See, e.g., People v. Chin,* 146 Misc.2d 431, 550 N.Y.S.2d 778 (Crim.Ct.N.Y.Cty.1989) (misdemeanor information dismissed on speedy trial grounds where delays caused by difficulty in finding Cantonese interpreter). This court is constantly faced with analogous subtle differences in meaning based on pronunciation and vocabulary involving differences in the Spanish spoken in many countries and regions.

### B. *Burden on the Government*

■ Costs alone do not override constitutional rights. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (indigent criminal defendant has right to court-appointed counsel); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (convicted indigent defendant entitled to copy of transcript for appeal at government expense). "The use of courtroom interpreters involves a balancing of the defendant's constitutional rights to confrontation and due process against the public's interest in the economical administration of criminal law." *United States v. Martinez,* 616 F.2d 185, 188 (5th Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). If the government cannot afford to provide due process to those it prosecutes, it must forego prosecution.

■ The fact that there is a shortage of qualified interpreters in the federal courts may not defeat a criminal defendant's Sixth Amendment interests. In response to similar arguments against the appointment of interpreters, Professor Wigmore astutely observed:

Injustice is doubtless being done from time to time in communities thronged with aliens, through failure of the judges to insist on a supply of competent interpreters. The subject is one upon the profession are in general too callous, for no situation is more full of anguish than that of an innocent accused who cannot understand what is being testified against him.

5 John W. Wigmore, *Evidence,* § 1393 (Chadbourn rev. 1974) (footnotes omitted).

## III. APPLICATION OF LAW TO FACTS

The order of December 9 is a reasonable construction of the Court Interpreter's Act. It is consistent with the Act's mandated goals of enhancing parties' comprehension of the proceedings and communication with others involved in the proceedings. Nothing in the Act limits the court's discretionary power to order that key documents be translated by the government.

Assuredly, the court must be realistic about budgets and bureaucracy. The main budget for interpretation and translation is under the Criminal Justice Act (CJA). The Department of Justice itself does require the use of interpreters to interview non-English speaking witnesses, interpret overheard conversations in foreign languages and translate documents in other languages which may be useful as evidence. Undoubtedly it has provided for such necessary interpreters within its budget.

The federal judges have repeatedly been warned that there are insufficient funds to pay CJA expenses in the federal courts' national budget. *See Judiciary Faces Broad Spending Reductions,* The Third Branch, Newsletter of the Federal Courts, Jan. 1993 at 1. This court has been urged to forego ordering expenses that will deplete CJA funds. The courts must recognize that the large increase in criminal jurisdiction of federal courts, the use of long minimum sentencing and guideline sentencing, and the rapid expansion of prosecutorial staffs has put a strain on all aspects of the federal criminal system. The price for the publicity in "tough on crime" slogans must now be paid. Just as the courts lack budget for CJA

responsibilities, our probation services do not have facilities for mandated community treatment. Presumably, Congress and the President will now review the laws and appropriations to increase congruence between pretention and reality.

A court mandated sudden shift of major costs from one budget to another must, however, require consideration by Congress. Until Congress reconsiders the matter, a sensible division of responsibility that adequately protects defendants' constitutional rights can be accomplished as follows without bureaucratic strains.

 When a defendant in the present case is not fluent in English:

1. The United States Attorney shall supply a copy of the indictment and relevant statutory provisions referred to in the indictment with a written translation at or before the time of pleading. Since most indictments are boilerplate, the cost of supplying translations given the availability of computers will be almost *de minimis*.

2. Once CJA counsel is appointed the burden of supplying translation during pre-trial and trial shall be on CJA staff or authorized CJA experts, except as provided in 3 and 4. Defendants who have private counsel shall pay for their own translations and out-of-court interpreters unless the court orders otherwise. Where documents are translated by the government as, for example, where transcripts of telephone recordings are to be used at trial, or under CJA, they shall be shared without charge with all defendants whether or not privately represented.

3. Interpretations of written plea agreements shall be supplied by the United States Attorney to any defendant whether or not represented by CJA counsel. These agreements are also generally largely boilerplate. Counsel may waive this requirement and supply the defendant with a translation by a CJA staff or an expert approved by the court for payment under CJA.

4. Interpretations of the presentence report shall be supplied by Probation. It is this obligation that may create the most difficult initial budgetary problem. That it is, however, essential is clear from the blank stares that the court often gets from a non-English speaking defendant when asked if he or she understands the document and counsel indicates the document was, in fact, orally interpreted. Until new budgetary arrangements are made, counsel should waive this requirement and supply the defendant with a written translation by CJA staff or expert approved by the court for payment under CJA.

5. Upon application, the court may modify or change these guidelines.

It is recommended that, subject to action by the United States Judicial Conference or Congress, the United States Department of Justice, the Administrative Office and the Judicial Center jointly consider use of present and future technology in reducing the costs of interpretations and translations. Computers may be programmed to read and translate. *See, e.g., New Products,* Computerworld, Sept. 2, 1991 at 46 (describing Logos Intelligent Automatic Natural Translation Software which translates English and German Language text into English, German, Spanish, French and Italian). Given available technology, the total cost of interpreters to the taxpayer can be possibly substantially reduced. Cooperation between state and federal courts in a district such as the Eastern District of New York to share computers and technical staff is desirable.

Based on suggestions made at the hearing of March 3, 1993, it would be useful to provide for those not familiar with the American legal system a short primer in the federal criminal legal system. Such a pamphlet could indicate briefly such matters as how our criminal justice system operates and what it means to waive an indictment or plead guilty; what are the elements of a trial; and what are the roles of grand and petty juries, attorneys, judges and magistrate judges. It would not be a comprehensive statement of rights. The various amici, counsel and Metropolitan Area bar associations could cooperate in providing such a pamphlet to be translated into some of the languages routinely used in this court.

This memorandum and order was circulated to the judges and magistrate judges be-

fore being released. There is not full agreement in this court on how the translation issue should be addressed. Nevertheless, it is the view of the undersigned that this order will impose no unreasonable burden on the government were it extended to other cases. Only minor modifications of stock translations would be needed to adapt most indictments to the specific situation of an individual defendant. Although the initial translation may take some time, the computer technology currently available will ease the government's continuing burden.

## IV. CONCLUSION

Every non-English speaking criminal defendant shall be provided in this case with a translation of the indictment and relevant portions of the statutes referred to in the indictment.

■ Where a plea of guilty is entered in this case, such a defendant shall be provided with a translation of 1) the statutes referred to if they are different from those in the indictment, and 2) the written plea agreement.

■ Any pre-sentence report in this case shall be provided to defendant in translation whether there is a plea or finding of guilt at trial.

■ Other documents shall be translated in accordance with this order or as otherwise ordered by the court. With each translation, the government may include a statement indicating that the translation is solely for the benefit of the defendant and that there may be errors in the translation which may not form the basis for appeal since the original document in English governs.

We need not address at this time the more complex issue of whether the government is required to translate additional documents that may be needed for trial. In the instant case, that problem has been addressed by the appointment of an Administrative Coordinating Counsel, who is funded by CJA. She can decide, subject to court supervision, for all defendants, which documents require translation. Costs will be paid by CJA unless the court orders otherwise.

The court recommends that the able civil rights organizations who have appeared as amici on this matter join with the organized bar to utilize their resources and skills to prepare a pamphlet, which can be translated into different languages, to serve as a guide to the court system for non-English speaking defendants. Recommendations as to the interpretation and translation problem generally would also be helpful. The exigencies associated with this eighteen Spanish-speaking defendant complex case require a decision now to govern this case.

SO ORDERED.