Matter of Lizotte v Johnson (2004 NY Slip Op 24161)

Matter of Lizotte v Johnson

2004 NY Slip Op 24161 [4 Misc 3d 334]

January 8, 2004

Supreme Court, New York County,

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

As corrected through Wednesday, August 18, 2004

[*1]
In the Matter of Irma Lizotte, Petitioner,
v
John A. Johnson, as Commissioner of the New York State Office of Children and Family Services, et al., Respondents.
Supreme Court, New York County, January 8, 2004

APPEARANCES OF COUNSEL

Legal Aid Society, New York City (David W. Weschler and Palvi D. Mohammed of counsel), for petitioner. Michael A. Cardozo, Corporation Counsel, New York City (Joseph Cardieri and Debra E. Brown of counsel), for William C. Bell, as Commissioner of the New York City Administration for Children's Services, respondent. Eliot Spitzer, Attorney General, New York City (John P. Gasior of counsel), for John A. Johnson and another, respondents.

{**4 Misc 3d at 335} OPINION OF THE COURT

Doris Ling-Cohan, J. 
" 'The fundamental requisite of due process of law is the opportunity to be heard' . . . [which] must be tailored to the capacities and circumstances of those who are to be heard." (Goldberg v Kelly, 397 US 254, 267-269 [1970].)
Pursuant to CPLR article 78, Irma Lizotte seeks, inter alia, an order reversing, annulling and vacating the decision after fair hearing dated April 29, 2003, which affirmed the New York City Administration for Children's Services' (ACS) determination not to provide petitioner foster care payments at the special rate. Petitioner contends that the decision was arbitrary and capricious, without a rational basis in law, and that it is not supported by substantial evidence in the record. Petitioner also seeks a judgment reinstating the special rate foster care payments.
Respondents, in opposition, argue that the decision is neither irrational, arbitrary, capricious or in violation of the petitioner's right to due process of law. Moreover, respondents argue that the decision is supported by substantial evidence.[FN1]

For the reasons stated below, the petition is granted to the extent provided below.

History
[*2]
The ACS placed minor child C.L.[FN2]

in the foster care of petitioner, his stepgreat-grandmother, on December 15, 2000. Initially, the petitioner received foster care benefits at the regular rate. Psychiatric evaluations performed in 2001 and 2002 diagnosed C.L. with various disorders including Dysthymic Disorder-Early Onset and H/O Attention Deficit Hyperactivity Disorder.{**4 Misc 3d at 336}
On December 11, 2002, after ACS refused to provide petitioner with foster care benefits at the special rate on behalf of C.L., petitioner requested a fair hearing to review that determination. At the January 13, 2003 fair hearing, ACS offered to provide petitioner with the special rate foster care payments for the period December 15, 2000 to December 15, 2001; ACS also offered to evaluate petitioner's eligibility at the special rate for the period from December 16, 2001 forward and, if eligible, would provide such benefits to the petitioner. The petitioner accepted both offers.
On February 24, 2003, ACS determined that petitioner was not eligible for the special rate of foster care benefits because "the submitted documentation does not indicate any significant atypical behaviors or conditions severe enough as to require an unusual level of care or supervision within the meaning of Special Rate Regulations" (notice of disapproval). Petitioner requested another fair hearing.
At the April 16, 2003 fair hearing, petitioner appeared pro se and required the assistance of a translator, who translated part of the proceedings. Petitioner testified, inter alia, that C.L. needs a lot of attention and that she must watch him constantly because, if left alone, he would become violent with his sister or other siblings. She also testified that C.L. attends a special school, where he sees a counselor weekly and continues to take medication for his behavioral disorder.
In a decision dated April 29, 2003, the hearing officer upheld ACS' determination not to provide petitioner with foster care benefits at the special rate from December 16, 2001 to the present. Petitioner has now initiated the present proceeding challenging that decision.

Applicable Statutes and Regulations

Section 398-a of the Social Services Law requires the Office of Children and Family Services (CFS) to promulgate regulations establishing standards for payment for foster care services. Pursuant to that delegation, CFS provides that, if approved by the state agency, social services districts are eligible to receive state reimbursement payments for special foster care services at a special rate made on behalf of children who suffer from pronounced physical conditions as a result of which a physician certifies that they require a high degree of physical care, or have been diagnosed by a qualified psychiatrist or psychologist as being moderately developmentally disabled, emotionally disturbed {**4 Misc 3d at 337}or having a behavioral disorder to the extent that they require a high degree of supervision. (18 NYCRR 427.6 [c].)
Foster care payments are reimbursed, in part, by the federal government pursuant to title IV-E of the Social Security Act (42 USC § 670 et seq.). In order to be eligible for reimbursement for foster care maintenance payments under the Social Security Act Foster Care and Adoption Assistance (42 USC § 670 et seq.), a state receiving title IV-E assistance must "provide . . . an opportunity for a fair hearing . . . to any individual whose claim for benefits available pursuant to [title IV-E] is denied or not acted upon with reasonable promptness." (42 USC § 671 [a] [12].) The procedures and requirements of 45 CFR 205.10 governing administrative fair hearings generally apply to all programs funded under title IV-E. (45 CFR 1355.30 [k].)
18 NYCRR part 358, which governs administrative hearings concerning foster care benefits sets forth the rights and responsibilities of participants in administrative fair hearings and defines the obligations of the hearing officer. The regulation provides that administrative fair hearings must be conducted by an "impartial hearing officer" who has an obligation to "ensure a complete record." (18 NYCRR 358-5.6 [a], [b].) As such, the hearing officer must, [*3]inter alia, make an opening statement, explaining the nature of the proceedings, the issues to be heard and the manner in which the hearing will be conducted. (18 NYCRR 358-5.6 [b] [2].) The officer is duty bound to elicit documents and testimony, including questioning the parties and witnesses, particularly where the appellant demonstrates difficulty or inability to question a witness. (18 NYCRR 358-5.6 [b] [3].) The hearing officer is empowered with the discretion to issue subpoenas and/or require the attendance of witnesses and the production of books and records where necessary to develop a complete evidentiary record. (18 NYCRR 358-5.6 [b] [8].)

Discussion

Petitioner raises, in essence, two claims. First, she contends that the hearing officer's conduct at the fair hearing was arbitrary and capricious and a violation of her right to due process of law. Second, she argues that the decision is not supported by substantial evidence. While this court may agree that the decision was not so supported, if that were the only question, this proceeding would need to be transferred to the Appellate Division pursuant to CPLR 7804 (g).{**4 Misc 3d at 338}
However, this court finds that the hearing officer's failure to develop the record and to ensure that the hearing was conducted in compliance with the minimum requirements of due process deprived petitioner of her right to a "fair" hearing and due process of law and, therefore, the decision was arbitrary and capricious. Petitioner has established her entitlement to an order, pursuant to CPLR 7803, vacating and annulling the decision and remanding this matter for a new hearing consistent with this decision.
At the outset, it is without question that a foster parent is entitled to a full due process hearing to challenge the failure to receive foster care maintenance payments at the rate sought. (Matter of Claudio v Dowling, 89 NY2d 567 [1997].)
It is well established that, at such hearing, the hearing officer must assist the unrepresented appellant to present evidence and the failure of the hearing officer to develop the testimony presented by a pro se appellant effectively deprives that appellant of a fair hearing. (18 NYCRR 358-5.6 [a], [b]; Matter of Feliz v Wing, 285 AD2d 426, 427 [1st Dept 2001] ["the brevity of the hearing and the ALJ's complete failure to develop the testimony presented by the pro se petitioner effectively deprived her of her right to a fair hearing"]; Matter of Schnurr v Perales, 115 AD2d 740, 741 [2d Dept 1985] ["The brevity of the hearing and the Administrative Law Judge's abrupt termination of the proceedings without any attempt to delineate the issues upon which the hearing was to focus or to develop the testimony presented by the pro se petitioner effectively deprived her of her right to a fair hearing"]; Matter of Hendry v D'Elia, 91 AD2d 663, 663 [2d Dept 1982] ["the administrative law judge should have assisted petitioner by directing her to testify about her work during the month of August"]; Matter of Dreher v Smith, 65 AD2d 572, 573 [2d Dept 1978] ["Petitioner was appearing pro se and was not given proper notice and assistance with respect to the nature of the issues. Nor was there sufficient development by the hearing officer of the testimony presented by her"]; Matter of Rezoagli v Toia, 62 AD2d 1020, 1020 [2d Dept 1978] ["Ms. Battaglia was not accorded the opportunity to make a clear presentation of her evidence on the issue of the agency's prior approval and was not advised of her right to procure an adjournment of the hearing to enable her to produce witnesses essential to her case"]; Zsedel v Toia, 60 AD2d 883, 883-884 [2d Dept 1978] ["the hearing officer failed to uphold his duty to protect the rights of the parties [in that although the {**4 Misc 3d at 339}appellant] was not clear as to what he was offering, . . . in view of his age and the fact that he appeared without counsel and lacked knowledge of legal theories or of evidence relevant under them, the hearing officer cannot be excused for the impatient and intimidating manner in which he conducted the hearing"].)
Here, the hearing officer failed to: (1) explain the nature of the hearing and the showing that the petitioner needed to make in order to prevail; (2) show any of the documents offered by ACS to petitioner; (3) ensure that petitioner received adequate translation; and (4) ensure a complete record by developing testimony that would go to the question of whether the petitioner's great-grandson required a high degree of supervision.
[*4]
(1) Failure to explain or delineate the relevant issues

First, in order for petitioner, a pro se appellant, to have had any hope of prevailing at the hearing, she would have needed to establish that her great-grandson required a high degree of supervision. (18 NYCRR 427.6 [c].) Yet, the hearing officer's explanation of the purpose of the hearing and the burden of proof was limited solely to asking the petitioner if the reason she was at the hearing was because "the Agency failed to provide her with the special rate of foster care benefits . . . from January 2002 to present." (Hearing transcript at 2-3.) There was no reason for the hearing officer to assume that the petitioner knew what she needed to establish and, therefore, the hearing officer utterly failed to "delineate the issues so that [pro se] petitioner would know the conditions under which she would be entitled to a grant of assistance and be in a position properly to present her case." (Matter of Blackman v Perales, 188 AD2d 339, 340 [1st Dept 1992]; see also Matter of Roche v Turner, 186 Misc 2d 581 [Sup Ct, NY County 2000].)

(2) Failure to provide an opportunity to review the exhibits

Second, the hearing officer simply did not show any of the exhibits submitted by ACS to the appellant or offer the appellant an opportunity to review those documents. As the Supreme Court observed in Greene v McElroy (360 US 474, 496 [1959]):
"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual{**4 Misc 3d at 340} so that he has an opportunity to show that it is untrue . . . [T]his is important in the case of documentary evidence . . . ."
The record shows that the hearing officer accepted all of the documents that ACS sought to have considered without even identifying them for the record:
"mr. watson: And subsequent to that decision, Judge, the Agency made a determination that C.L. was not eligible for the special board rate (inaudible three to four words).
"judge kuku: I'll mark the special rate denial Agency 2. (Whereupon, the above-described document was marked for identification and received into evidence as Agency's Exhibit Number 2, this date.)
"mr. watson: And (inaudible for words) packet that was submitted on behalf of C.L.
"judge kuku: Okay. I'll mark the packet Agency 3. (Whereupon, the above-described document was marked for identification and received into evidence as Agency's Exhibit Number 3, this date.)
"mr. watson: I'm going to hand you what the Agency plans to continue to submit, and you can mark it (inaudible one word).
"judge kuku: That Agency what?
"mr. watson: I said I'm going to hand you what the Agency intends to continue to submit
"judge kuku: Okay.
"mr. watson:and you can mark them (inaudible two words).
"judge kuku: Okay, this is part of the psychiatric evaluation.
"mr. watson: Yes, sir.
"judge kuku: I'll mark the psychiatric evaluation Agency 4. (Whereupon, the above-described document was marked for identification and received into evidence as Agency's Exhibit Number 4, this date.)
"mr. watson: That's a different one, Judge . . .
[*5]
"mr. watson: The entirein addition to what was already sent to ACS, the ACS had actually gone to the Agency to submit all the evaluations th[ey] had on behalf of C.L. (inaudible three words). That was the {**4 Misc 3d at 341}original packet, and what you're going to continue to mark is the rest of his psychiatric and psychological evaluation.
"judge kuku: I'll mark this Agency 4. Agency 5, 5-A. Agency 6. (Whereupon, the above-described document was marked for identification and received into evidence as Agency's Exhibit Numbers 5, 5-A and 5-B, this date.)" (Transcript at 4-7.)
In fact, seven exhibits are presented by ACS and entered into evidence. The documents are not even shown to the petitioner, let alone explained as to their contents. Appearing pro se, it is unreasonable to expect the petitioner to know the procedure for objecting to the submission of evidence without a full and fair opportunity to review that evidence, especially when the hearing officer fails to assist by explaining to the petitioner the nature of the documents being submitted and why those documents are relevant to the hearing. Moreover, at a bare minimum, due process demands that the petitioner be afforded an opportunity to review the evidence submitted. (Greene, 360 US at 496-497.)
Had the petitioner had a realistic opportunity to review the documents that ACS submitted and had she been assisted to understand her burden of proof, she might have chosen to point out to the hearing officer the numerous places in the various reports of psychologists and psychiatrists where the foster child is described as suffering from "rages," exhibits "aggressive" tendencies, presents "parent-child relational problems," and "in general . . . can be very oppositional or defiant."

(3) Failure to provide adequate translation services

Moreover, while the transcript indicates, in certain places, when the interpreter translated for the petitioner, there is no indication in the transcript that the interpreter translated any of the discussion between the hearing officer and the ACS representative concerning the seven documents submitted into evidence or that the actual exhibits were translated in whole or in relevant part. As a consequence, petitioner was left completely in the dark as to the nature of the proceeding transpiring before her.
The failure of the hearing officer to require that all of the testimony of the ACS representative and the discussions between the hearing officer and that representative be translated, as well as the relevant documents, deprived petitioner of fundamental due process. For all intents and purposes, petitioner{**4 Misc 3d at 342} might as well have not been in the room for the period of time during which the hearing officer accepted from the ACS representative the documents that would ultimately form the basis for the adverse decision.
While there is no specific state or federal constitutional provision governing the right to have interpretive services furnished in a court, our courts and legislative bodies have long recognized the need for such services to ensure meaningful participation. In the criminal context, it is well established that failure to provide interpreters is a deprivation of due process. (See United States ex rel. Negron v New York, 434 F2d 386 [2d Cir 1970] [interpreter required for non-English-speaking defendants]; People v Ramos, 26 NY2d 272 [1970] [criminal defendant who cannot understand English is entitled to appointment of an interpreter who speaks language that the defendant understands so that he may meaningfully assist in his own defense]; United States v Mosquera, 816 F Supp 168, 178 [ED NY 1993] [translation of indictment, relevant statutes, plea agreements and other documents required for non-English-speaking criminal defendants]; see also 28 USC §§ 1827, 1828 [Judiciary and Judicial Procedure Act; allows the assignment of interpreters in federal trials and proceedings].) The state courts have also recognized that interpreters are necessary to ensure meaningful participation in the context of civil cases. (See Yellen v Baez, 177 Misc 2d 332, 336 [Civ Ct, Richmond County 1997] ["To require the tenant to proceed when it is obvious that an interpreter is needed would violate due process of law"].) New York statutes provide for the hiring of court interpreters and the appointment of interpreters [*6]for deaf parties or witnesses. (Judiciary Law §§ 386, 390.)
As language is the principal basis of communication in a trial or hearing, a litigant's ability to understand and communicate that language is critical to the proceeding's fairness. The failure to provide adequate translation services here deprived petitioner of fundamental due process. The due process requirement of an "opportunity to be heard" which must be "tailored to the capacities and circumstances of those who are to be heard" demands no less. (See Goldberg v Kelly, 397 US 254, 268-269 [1970].) It is readily apparent from the subject decision that the hearing officer used the exhibits submitted by ACS, which were never shown, explained, translated (in whole or in relevant part), nor fully identified to petitioner, as the entire basis for her adverse decision; the hearing officer makes clear that she discounted {**4 Misc 3d at 343}petitioner's unrebutted testimony and relied on the rest of the "record," a "record" consisting of documents which petitioner was in the dark about: "In this case, notwithstanding the Appellant's testimony, the record fails to support the Appellant's contention that C.L. was eligible for special foster care benefits for the period from December 16, 2001, to present." (Decision at 6.)

(4) Failure to develop the record

Finally, the transcript clearly demonstrates that the hearing officer did virtually nothing to develop the record. For example, despite the fact that eligibility for the special rate hinges, in large part, on the need for supervision, the hearing officer asks no relevant follow-up questions when the petitioner testified that the foster child tends to hit other children and, therefore, the school principal required her to seek professional intervention (transcript at 12-14). Instead, the hearing officer asks only whether the principal is "a medical practitioner." (Transcript at 13.) Similarly, the hearing officer does not ask any follow-up questions when petitioner testifies that the foster child is "uncontrollable" on the school bus. (Id.)
Petitioner's testimony that her foster child is "a child who need[s] a lot of attention or more attention" (transcript at 14) provides an opportunity for the hearing officer to elicit further details. However, the hearing officer utterly failed to ask any questions on this subject.
The hearing officer also did nothing to develop the record when the petitioner testified that "[h]e would hit P.L., his sister, all the time. When I go outside, he has to be careful. At no moment or at no time can I leave him alone because at any time he will throw or push P.L. Also in school they have told me when he's annoyed, he's aggressive."
(Transcript at 16.) The hearing officer does not elicit any details, but asks only whether the petitioner has "house rules." (Transcript at 16-17.)
In addition, when the pro se petitioner testifies that C.L. is enrolled in a special school and is counseled by a psychiatrist, the hearing officer fails to inquire into the nature of the school and the type and frequency of the counseling, or even why he must attend a special school rather than an ordinary public school. Instead, the hearing officer impatiently focuses on whether C.L. sees a doctor apart from his psychiatrist:
"interpreter: He needs a lot of attention. I have to keep taking him to a psychiatrist. Also medication that are going to be prescribed to him every 30 days,{**4 Misc 3d at 344} and right now in a school, in a special school. He has counseling and also a psychiatrist.
"judge kuku: You said that (indecipherable word). You said that already (indecipherable word). How often does C.L. see a doctor apart from the psychiatrist? (The interpreter translates for the appellant.)
"interpreter: For checkups.
"judge kuku: Routine checkups.
"interpreter: When we get a (indecipherable one word), but it's not the psychiatrist. It's a different doctor.
"judge kuku: Is he a healthy boy?[*7](The interpreter translates for the appellant.)
"ms. lizotte: Yes, m-m h-m-m." (Transcript at 14-15.)
As a matter of fundamental fairness and equity the hearing officer should have inquired into the relevant facts to provide a more complete record, especially considering the petitioner's pro se appearance and her inability to speak English. This court has the power to remit a matter to the agency where "further agency action is necessary to cure deficiencies in the record." (Matter of Police Benevolent Assn. of N.Y. State Troopers v Vacco, 253 AD2d 920, 921 [3d Dept 1998], lv denied 92 NY2d 818 [1998]; see, Matter of Montauk Improvement v Proccacino, 41 NY2d 913 [1977].) Here, a new hearing is necessary to afford petitioner an informed opportunity to explain whether her foster child meets the definition of a special needs child.

Conclusion

The failure of the hearing officer to fully develop the record and to ensure that the hearing was conducted in compliance with the minimum requirements of due process deprived petitioner of her right to a fair hearing and due process of law.
As to the petitioner's contention that the City agency is required to show a basis for the change in rate after previously offering such rate pursuant to Matter of Adania C. v Hammons (236 AD2d 315 [1st Dept 1997]), such contention is misplaced as the January 13, 2001 fair hearing was settled by the offer by ACS to: (1) provide petitioner with the special rate foster care payments for only the period December 15, 2000 to December 15, 2001; and (2) evaluate petitioner's eligibility for the special rate for the subsequent period (December 16, 2001 forward), and if found eligible, to provide such benefits.{**4 Misc 3d at 345}
Accordingly, it is hereby ordered and adjudged that the petition is dismissed as to respondent Brian J. Wing as he is not a proper party; and adjudged that the petition is granted to the extent of remanding this matter to respondents for proceedings in accordance with this decision.

Footnotes

Footnote 1: State respondent Wing asserts that he is not a proper party inasmuch as the decision under review was based on a hearing conducted by an agent of respondent Johnson and that the decision was issued by a designee of respondent Johnson. Petitioner, in her reply papers, does not dispute this assertion and, therefore, respondent Wing's application to dismiss is granted.

Footnote 2: The full name of the minor child has been redacted to protect his anonymity.